JUDGE McMAHON

14 CV 6740

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

————————————————————

HILARY RHODA, HRH GROUP, INC.,            )
                                          )
                          Plaintiffs,     )
                                          )
             - against -                  )
                                          )
MARIANNE K. RHODA,                        )
                                          )
                          Defendant.      )
                                          )
————————————————————

Index No.

COMPLAINT
AND JURY DEMAND

RECEIVED

AUG 20 2014

U.S.D.C. S.D. N.Y.
CASHIERS

    Plaintiffs Hilary Rhoda and HRH Group, Inc., by and through their attorneys, Rosenberg
& Giger P.C., as and for their Complaint against defendant Marianne K. Rhoda, allege and aver
as follows:

## NATURE OF THE ACTION

    1.    Defendant Marianne K. Rhoda ("M. Rhoda" or "defendant") is plaintiff Hilary

Rhoda's mother.  As one would expect in light of that relationship, when Hilary began modeling

professionally at the age of sixteen, defendant accompanied Hilary to castings and photo shoots

and provided maternal support and guidance to her minor daughter.  As Hilary became

increasingly successful over the years, however, defendant's conduct began to defy more and

more the rational expectations of a mother's conduct toward her daughter.  While Hilary

rightfully assumed that defendant's involvement in her professional activities was principally

motivated by parental concerns, in fact, as set forth below, defendant manipulated her familial

role to improperly seize - - and then abuse - - enormous power over Hilary's finances and career.

    2.    In this regard, commencing in or about 2007, M. Rhoda purported to act

simultaneously in the conflicting roles of Hilary's "business manager" and "personal manager,"

despite her abject lack of qualifications or ability to adequately perform either of those

significant roles, and notwithstanding that, from the age of sixteen, Hilary was at all times represented by world-class modeling agencies and other professionals who were more than capable of successfully shepherding her career.

3.     In 2007, when Hilary, at only nineteen years of age, entered into a lucrative contract as a "new face" of cosmetics giant Estée Lauder, defendant solidified her ironclad control over Hilary's finances and business affairs.  Forging Hilary's signature to corporate formation documents, M. Rhoda purported to establish a "furnishing company," plaintiff HRH Group, Inc. ("HRH"), through which Hilary's professional and financial activities would be conducted.  Despite the fact that Hilary owned HRH, defendant appointed herself as "Vice President" of the company and assumed sole authority and control over HRH's (and thus Hilary's) financial affairs, paying herself substantial "compensation" from HRH's funds.  Other than her dominance over Hilary's finances, however, M. Rhoda, who, as stated, lacked the knowledge or experience necessary to meaningfully contribute to Hilary's modeling career, left to other professionals who represented Hilary the task of securing engagements, negotiating important contracts and similar "heavy lifting."

4.     As Hilary grew older, she understandably became interested in acquiring more knowledge of, and involvement in, her finances and the business side of her modeling career. Despite her multiple (albeit conflicting) fiduciary roles, M. Rhoda rebuffed Hilary's repeated requests for financial records and other information concerning HRH's business operations.  At the same time, apparently fearful of losing her advantageous position, defendant emphatically dismissed any effort by Hilary to consult with other professionals concerning her finances and related aspects of her career.

5.      In early 2014, Hilary suggested to M. Rhoda that the two should take a break from their professional interactions and focus on their mother-daughter relationship.  M. Rhoda responded to Hilary's suggestion with a swift and aggressive, but ultimately baseless, legal response:  M. Rhoda sent her daughter a "Notice of Default" under a purported written management agreement that M. Rhoda, years earlier, had induced Hilary to sign and of which Hilary had no recollection.

6.      M. Rhoda's combative behavior resulted in the deterioration of her relationship with her daughter and led the parties down the unfortunate path to the present action. As a result, Hilary began to investigate M. Rhoda's prior involvement in Hilary's finances and career, although Hilary was significantly hindered in those efforts by M. Rhoda's failure to cooperate and concomitant refusal to provide Hilary with the financial records of HRH, an entity that Hilary solely owns.  Despite M. Rhoda's obstruction and intransigence, the shocking results of Hilary's investigation include, without limitation, defendant's:  (1) forgery of Hilary's signature to tax, pension and corporate documents; (2) unauthorized establishment of an HRH retirement plan, and diversion of substantial funds belonging to HRH into that plan for M. Rhoda's own benefit; (3) refusal to provide an accounting or produce HRH's books and records to plaintiffs; and (4) apparent unlawful diversion of substantial HRH funds to M. Rhoda's personal benefit through numerous highly suspect transactions, including substantial "counter withdrawals" from HRH's bank account, unexplained wire transfers and checks, and the use of HRH's corporate credit card to pay for hundreds of thousands of dollars of M. Rhoda's personal expenses.

7.      Through this action, Hilary and HRH seek redress for M. Rhoda's manifest breaches of fiduciary duty and other defalcations, explicated in more detail below, including monetary damages, a comprehensive fiduciary accounting and an injunction preventing M.

Rhoda from acting, or purporting to act, in any professional capacity on behalf of Hilary or HRH.

**PARTIES**

8.      Plaintiff Hilary Rhoda is a citizen of the State of New York.

9.      Plaintiff HRH Group, Inc. is a corporation duly organized under the laws of the Commonwealth of Virginia with its principal place of business in New York, New York. Plaintiff Hilary Rhoda is (a) the 100% owner and sole shareholder of HRH; and (b) the sole member of the HRH Board of Directors, following defendant M. Rhoda's removal as a Director in March of 2014.

10.     Defendant Marianne K. Rhoda is a citizen of the State of Maryland. M. Rhoda is the mother of plaintiff Hilary Rhoda and, as set forth below, has purported at various times to act as Hilary's business manager and personal manager and as a supposed "Vice President" of HRH.

**JURISDICTION AND VENUE**

11.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, in that this is an action between citizens of different states and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

12.     This Court has personal jurisdiction over M. Rhoda pursuant to, *inter alia*, CPLR § 301 and 302(a), as she has regularly transacted business in this State in connection with the matters and claims at issue in this litigation; her alleged contract with Hilary was executed in New York; and she owns two residences in this State, an apartment in Manhattan and a home in the Hamptons, and thus maintains a regular presence in this State.

13.     Venue is proper in this judicial district pursuant to, *inter alia*, 28 U.S.C.

§§ 1391(a)(1) and (a)(2), as a substantial portion of the events and omissions giving rise to

plaintiffs' claims occurred within this judicial district.

## FACTUAL BACKGROUND

### Commencement of Hilary's Career

14.     Hilary began to model professionally in or about 2003, while a sophomore in high

school in Chevy Chase, Maryland.

15.     As Hilary was still a minor at that time, and attending high school, her modeling

activities occurred predominantly on weekends and during vacations from school.  As one would

expect, Hilary's mother regularly accompanied her on modeling jobs.  M. Rhoda had no training

or experience in the modeling business, and her involvement in Hilary's professional activities

during her high school years was maternal, not professional.

16.     Commencing in or about 2003, Hilary was represented in her professional

activities by "Click Models," a well-regarded modeling agency located in New York City.

17.     Following her graduation from high school in 2005, Hilary moved to New York

City to pursue a full-time modeling career.

18.     Shortly after moving to New York City, IMG Models ("IMG"), a world-class

modeling agency with international reach, began to represent Hilary in virtually all aspects of her

career.  At all times since, Hilary has been represented by top-tier modeling and management

agencies, including IMG, Women Management and Elite Model Management Corporation.

19.     Hilary's mother, defendant M. Rhoda, moved to New York City with Hilary in

2005 and often accompanied Hilary to castings, photo shoots and other professional

engagements as Hilary's career developed.  Because of Hilary's representation by first tier

agencies, her mother's involvement in her career was not professionally necessary, but was motivated - - or at least Hilary believed it was motivated - - by familial and maternal instincts, particularly in light of Hilary's young age.

20.     M. Rhoda has no training and had no prior experience in the modeling industry. M. Rhoda is not a C.P.A. and, on information and belief, has no training in accounting or other financial disciplines or in legal or contractual matters.  On information and belief, M. Rhoda has never purported to act as the agent, business manager or personal manager for any model (or other individual) except Hilary.

21.     Nonetheless, starting in or about 2007, M. Rhoda purported to begin acting as Hilary's business manager and personal manager.

22.     A business manager is responsible for handling the financial, accounting, tax, insurance and related aspects of the professional activities of individuals involved in the entertainment industry.  In order to effectively perform those functions, a business manager needs extensive experience and knowledge in all of those areas.  A business manager is a fiduciary of the individuals that she represents.

23.     A personal manager is responsible for guiding and supervising all aspects of the career direction, image and professional activities of individuals involved in the entertainment industry.  In order to effectively perform those functions, a personal manager needs extensive experience in all aspects of the businesses in which her clients are involved, knowledge of contractual and legal matters, highly developed negotiating skills, and a substantial network of contacts in the entertainment industry, including with lawyers, accountants, business managers, agents, consultants and the like.  A personal manager is a fiduciary of the individuals that she represents.

6

24.    One of the responsibilities of a business manager is to monitor the financial and related activities of the personal manager of the clients that the business manager represents.

25.    One of the responsibilities of a personal manager is to monitor the performance and activities of the business manager of the clients that the personal manager represents.

26.    In light of the foregoing, *inter alia*, it generally constitutes a significant conflict of interest for an individual to act as both the personal manager and the business manager of the same client.

27.    At the time that M. Rhoda purported to assume the roles of dual fiduciary - - *i.e.*, Hilary's business manager and personal manager - - and continuing until the date she and Hilary severed their professional relationship in 2014, M. Rhoda was abjectly unqualified to perform the functions and responsibilities essential to those positions.  One result of M. Rhoda's lack of qualifications was that M. Rhoda relied upon multiple additional professionals to fulfill those functions on behalf of Hilary, such as accountants, attorneys and modeling agencies, which caused Hilary to incur substantial additional professional fees above and beyond commissions paid to M. Rhoda.

28.    At the time that M. Rhoda began acting as Hilary's personal manager and business manager, she had no functional office from which to work, no office equipment, and no staff to support her efforts.

29.    In or about 2007, defendant moved from New York City back to Maryland, yet insisted on continuing in her supposed professional roles for Hilary, who remained in New York City.  M. Rhoda was so ill-equipped to adequately perform the functions attendant to those roles that Hilary traveled to Maryland to clean and organize space for a home office for defendant; opened an e-mail account for defendant; purchased defendant basic office equipment, including a

computer, printer and scanner; and advised defendant to obtain a mobile email device, so that she

would more accessible for work purposes.

30.      In addition to being unqualified to fulfill the responsibilities attendant to her

supposed roles as Hilary's business manager and personal manager, by purporting to

contemporaneously act in those dual fiduciary capacities, M. Rhoda was acting under a disabling

conflict of interest, one that was only exacerbated by the fact that she is also Hilary's mother and

thus assumed yet a further position of confidence and trust in relation to Hilary.

**Estée Lauder and the Creation of HRH Group, Inc.**

31.      In or about January of 2007, Hilary signed an exclusive contract to appear as a

model and act as a spokesperson for the prestigious cosmetics firm Estée Lauder.  The Estée

Lauder contract vastly increased Hilary's visibility in the fashion industry and directly led to a

substantial increase in her modeling income.  M. Rhoda did not secure that lucrative opportunity,

which was obtained and negotiated by Hilary's agency, IMG.

32.      In March of 2007, shortly after the execution of the Estée Lauder agreement,

defendant created and incorporated HRH to act as Hilary's "furnishing" company - - *i.e.*, the

entity through which Hilary would pursue her professional modeling and related business

activities.  At the time of incorporation, and at all times thereafter, Hilary has been the sole

shareholder and a Director of HRH.

33.      On information and belief, at the time of HRH's incorporation, M. Rhoda

arranged to be designated a Director of the corporation by HRH's incorporator.

34.      On or about March 9, 2007, pursuant to a document entitled "Joint Omnibus

Action By Unanimous Consent of Directors and Shareholders," M. Rhoda purported to appoint

herself as a "Vice President" of HRH.  While this document was ostensibly signed by both

Hilary and M. Rhoda as "Directors" of HRH, M. Rhoda forged Hilary's name to that purported corporate "Action," and Hilary was unaware of defendant's self-appointment as a supposed "Vice President" of HRH.

35.     Prior to the present dispute, M. Rhoda did not disclose to Hilary, or provide her with copies of, the HRH corporate formation documents.

36.     On information and belief, after appointing herself a Vice-President, *i.e.*, a supposed employee of HRH, M. Rhoda began to justify her unauthorized diversion of funds from HRH banks accounts by considering it "salary," but failed to disclose that fact to Hilary.  M. Rhoda was never an actual or *bona fide* employee of HRH.

37.     In fact, M. Rhoda affirmatively misrepresented to Hilary the nature and scope of M. Rhoda's duties, responsibilities and relationship in respect of HRH and Hilary's professional activities.  In this regard, M. Rhoda advised Hilary that, while HRH would act as Hilary's furnishing company, *i.e.*, it would "furnish" her services to contractual counterparties, defendant's role was to act as Hilary's "business manager" and "personal manager," for which she would receive certain commissions for specific services that she performed for Hilary. Defendant did not disclose to Hilary, and Hilary had no understanding, that M. Rhoda was contemporaneously purporting to operate as an "officer" or "employee" of the corporate entity, HRH, and was also filing W-2 forms purporting to report her receipt of a "salary" from HRH.

38.     At all times prior to the revelation of contrary facts in connection with the present dispute, it was Hilary's understanding - - based on M. Rhoda's specific representations - - that M. Rhoda's compensation for specific services that she performed for Hilary was limited to certain commissions paid by HRH, solely in respect of M. Rhoda's activities as Hilary's purported business manager and personal manager.

39.     From the moment that she fraudulently formed HRH, M. Rhoda exclusively controlled the company's finances.  In that regard, defendant established HRH's bank accounts and maintained sole signatory authority and control over them.  Hilary had no direct access to the bank statements, check book or other financial information of HRH.

40.     Defendant also established HRH corporate credit cards, with M. Rhoda holding the primary account and establishing related accounts for Hilary, and for Hilary's older brother - - despite the fact that he had no involvement in either HRH or Hilary's professional activities. Hilary did not receive copies of HRH credit card statements, which - - with a few minor exceptions in 2007 - - were sent to and paid directly by M. Rhoda using exclusively HRH funds.

41.     When Hilary inquired of M. Rhoda concerning her brother's credit card account, M. Rhoda initially misrepresented to Hilary that M. Rhoda paid that balance from her own funds and then, later, claimed that Hilary's brother paid the balance himself.  Both assertions by defendant were false, since, as alleged above, M. Rhoda misused HRH funds to pay those balances.

42.     On information and belief, the modeling fees and other amounts that were paid in respect of Hilary's professional activities were deposited into the HRH bank accounts controlled by M. Rhoda, and were to be used solely to pay expenses associated with HRH and Hilary's professional endeavors.  As discussed below, however, unbeknownst to Hilary prior to the present dispute, defendant consistently treated those HRH accounts as her own personal "piggy bank," using corporate funds to pay what plainly were personal expenses and diverting to her own benefit far more than she could conceivably have been entitled to receive in commissions as a result of her purported dual and conflicting roles as Hilary's business manager and personal manager.

43.     From 2007 through early 2014, when the present dispute arose, through her dominion over the aforementioned HRH bank and credit card accounts, M. Rhoda exercised total control over HRH's and Hilary's financial affairs.  At the same time, M. Rhoda purposefully kept Hilary uninformed concerning the status of the accounts and the transactions that M. Rhoda undertook using those accounts, and dismissed Hilary's inquiries regarding these financial matters, assuring Hilary that M. Rhoda was handling the finances and that Hilary did not need to concern herself with the same.

44.     As M. Rhoda is Hilary's mother, Hilary completely trusted her and did not feel the need, as she would have with a third party, to monitor M. Rhoda's activities undertaken ostensibly on Hilary's behalf.  Most simply stated, Hilary never even considered the possibility that her mother would engage in the widespread financial improprieties and other defalcations that are summarized below.

**M. Rhoda's Inducement of the Purported "Management Agreement"**

45.     In 2010, through the efforts of Hilary and her modeling agency IMG, Hilary entered into a new agreement with Estée Lauder, pursuant to which Hilary was engaged to continue as a model and spokesperson for the brand.

46.     Shortly thereafter - - and, on information and belief, in an effort to seize yet further control over Hilary's business activities and finances in light of the lucrative renewed agreement with Estée Lauder - - M. Rhoda induced Hilary to sign a written agreement entitled "Business Manager Contract" (the "Purported Management Agreement"), which purports, *inter alia*, to appoint M. Rhoda as Hilary's "business manager," "individual manager" and "personal agent."

47.     To induce Hilary to sign the Purported Management Agreement, in or about November of 2010, when Hilary was 23 years old, M. Rhoda invited Hilary for a social visit to M. Rhoda's apartment in New York City.  During this visit, M. Rhoda, without prior notice to Hilary, simply presented a document to her daughter, suggested that it reflected a mere formality concerning M. Rhoda's role in Hilary's business affairs and asked Hilary to initial and sign the document.   M. Rhoda did not explain any of the terms and conditions of the Purported Management Agreement to Hilary and did not suggest that Hilary should consult with an attorney or other disinterested professional.  Once again trusting that her own mother had Hilary's best interests at heart, Hilary signed the Purported Management Agreement without reviewing or understanding its terms and without seeking the advice of an attorney or other professional.  M. Rhoda then took the signed document back from Hilary and, prior to the present dispute, Hilary had never received a copy of the same.

48.     The Purported Management Agreement is notable principally for its utterly one-sided terms inuring to the sole, substantial benefit of M. Rhoda, through which M. Rhoda purported to exert complete control over virtually every aspect of Hilary's career.  In this regard, the Purported Management Agreement includes draconian provisions, *inter alia*, requiring that *all* professional opportunities of Hilary first be presented to M. Rhoda; vesting M. Rhoda with *sole* discretion to decline any professional opportunities, without even consulting with Hilary; granting M. Rhoda the right to execute, again without Hilary's knowledge or consent, *any* agreement on behalf of HRH; authorizing M. Rhoda to *exclusively* control Hilary's media exposure and to represent Hilary in product and trademark licensing opportunities; and establishing a *fixed six-year term*, far longer than industry standard contracts with qualified professionals.  In addition, the Purported Management Agreement purports to grant to M. Rhoda

the right to receive a 15% commission - - triple the industry standard for even the best, most experienced business managers - - regardless of whether she plays any role in the generation of that income (and she did not, in fact, play any such role with respect to the vast majority of Hilary's income).

49.     Hilary was unaware of the forgoing terms at the time that she signed the Purported Management Agreement, and would not have executed the Agreement if M. Rhoda had made her aware of those terms.  Indeed, as M. Rhoda failed to give Hilary her own copy of the Purported Management Agreement, Hilary was unaware of these terms until the present dispute arose, when her mother first sought to enforce her purported rights under that Agreement and attached a copy of the Agreement to legal correspondence addressed to Hilary.

50.     From November of 2010, when Hilary signed the Purported Management Agreement, until the present dispute arose in early 2014, M. Rhoda never once alluded to that Agreement in any of her conversations or other communications with Hilary.

**Hilary Seeks Greater Personal Involvement in Her Career**

51.     During the period 2010 through 2014, Hilary continued to achieve ever-increasing levels of professional success.  M. Rhoda played little, if any meaningful role in Hilary's career development during that period, and Hilary was guided and counseled by her agency and the other professionals who assisted her in her career.

52.     As Hilary grew older and became more successful, she desired to be more involved in, and knowledgeable concerning, her financial and business affairs.  Toward that end, during the past few years, Hilary repeatedly asked M. Rhoda to provide her with information and documentation relating to her professional activities.  Defendant's uniform response was to

dismiss these requests and admonish Hilary to leave the financial and business matters exclusively to defendant.

53.     Commencing at least as early as 2012, Hilary repeatedly requested that M. Rhoda provide her with documentation and information concerning her income and expenses, which would, among other things, enable Hilary to better plan her own financial affairs.  M. Rhoda refused to provide the requested documentation to Hilary, a failure that has continued even following the recent termination of their professional relationship.

54.     In or about November of 2013, Hilary became engaged to Sean Avery.  At or around this time, M. Rhoda began a constant barrage of *ad hominem* attacks directed at Mr. Avery.  At the same time, apparently fearful of losing control over Hilary's finances and career, M. Rhoda voiced unfounded concern to Hilary that Mr. Avery and his own professional advisors were going to attempt to exert control over, and interfere with, Hilary's relationship with M. Rhoda.

55.     In early January of 2014, representatives of Hilary and Mr. Avery were exchanging certain financial information in anticipation of their marriage.  M. Rhoda seized control over this process insofar as it pertained to financial information related to Hilary and HRH.

56.     During this process, Hilary requested that M. Rhoda provide her with a copy of the information that she was providing to Mr. Avery's representatives.  Defendant initially refused to allow Hilary to obtain that information - - which pertained to Hilary's assets and liabilities - - ostensibly concerned that Hilary would reveal the same directly to Mr. Avery.  After Hilary renewed and repeated her overtures, in early January of 2014, M. Rhoda finally and reluctantly forwarded to Hilary the information that she had requested.

57.    This was the first occasion on which M. Rhoda had provided Hilary with any detailed financial information concerning her professional activities and HRH, despite Hilary's prior, repeated requests for the same.

58.    Following her receipt of this information, later in January of 2014, Hilary sought further financial information from M. Rhoda. Defendant refused to comply with that request.

**Hilary and M. Rhoda End Their Business Relationship**

59.    By late January of 2014, Hilary had become extremely frustrated with her mother's incessant disparagement of her fiancé, failure to disclose requested financial information and refusal to permit Hilary to deal with other professionals in the financial realm. Under the circumstances, Hilary became concerned that her business relationship with defendant might severely damage their mother-daughter relationship.

60.    As a result of these concerns, in late January of 2014, Hilary advised M. Rhoda that Hilary would like to begin handling more of her own affairs, particularly regarding financial matters. M. Rhoda stridently rebuffed Hilary's overtures in this regard.

61.    In early February of 2014, increasingly concerned about the state of her relationship with defendant, Hilary suggested to her in a text message that "[m]aybe we shouldn't be working together at all and you can just be my MOTHER and we can repair that relationship . . . ." M. Rhoda responded, "That isn't happening. I'm your manager and your mother."

62.    Remarkably, shortly after that exchange, on or about February 5, 2014, M. Rhoda served Hilary with a formal "Notice of Default" under the Purported Management Agreement.

63.    Prior to defendant's service of the Notice of Default, Hilary had not formally terminated her professional relationship with her mother; rather she had merely suggested that

possibility as a solution to the obvious difficulties that were plaguing them. Nonetheless, M. Rhoda's Notice of Default, which is addressed to "HRH Group, Inc., c/o Hilary Rhoda," asserts several alleged breaches of the Purported Management Agreement arising out of Hilary's supposed "firing" of M. Rhoda.

64.     M. Rhoda's transmittal of the Notice of Default, and her continuing refusal to permit Hilary to access financial information or take a more active role in her business affairs, forced her dispute with Hilary into the legal realm.

65.     In a letter to M. Rhoda dated February 26, 2014, responding to her "Notice of Default," plaintiffs - - through counsel that they retained after receiving that notice - - advised M. Rhoda that she had breached her fiduciary duties to H. Rhoda by, *inter alia*, her manifest conflict of interest in purporting to act simultaneously as Hilary's personal manager and business manager and her failure to provide adequate disclosure to Hilary of the one-sided terms of the Purported Management Agreement, which plaintiffs averred was "void *ab initio* and, as such, of no legal force or effect."

66.     In their February 26 correspondence, plaintiffs also proffered a "Notice of Default" to M. Rhoda, asserting that, even assuming (without conceding) the enforceability of the Purported Management Agreement, defendant had breached the same by failing to provide Hilary with the "Individual Management Services" that defendant was obligated to provide thereunder, including (1) failing to provide proper advice and counsel to Hilary concerning her career opportunities; (2) failing to negotiate Hilary's contracts; (3) failing to "hire, manage and control all other consultants" and other professionals; (4) failing to "develop, negotiate and administer" Hilary's "income producing opportunities"; and (5) failing to act as Hilary's "exclusive personal agent" in connection with Hilary's acting opportunities or her "product and

trademark licensing" opportunities.  As a result of these defaults, HRH unequivocally stated its

"intention, on Hilary's behalf, to terminate the [Purported Management] Agreement, formally

and in all respects."

67.     In addition, as a result of M. Rhoda's repeated refusal to provide Hilary with

financial and other business documentation concerning HRH and Hilary, plaintiffs' February 26

correspondence demanded that M. Rhoda, Hilary's fiduciary, produce various categories of

specified documentation to plaintiffs - - including tax filings, estate planning documents,

insurance policies, bank account statements and credit card statements - - and render a "full and

complete accounting of all commissions, payments, expense reimbursements and other funds or

consideration that have been paid" to M. Rhoda or any third-parties related to Hilary's

professional activities.

68.     In response to plaintiffs' February 26 letter, M. Rhoda failed to provide the

requested accounting.  Moreover, while M. Rhoda did disclose a small number of corporate

formation documents (such as the HRH Articles of Incorporation and Bylaws) and begrudgingly

facilitated Hilary's access to account statements from HRH's bank and credit card provider, she

has never made a complete financial disclosure to Hilary or HRH.

69.     While plaintiffs have been able to review transactions to and from the HRH bank

accounts, M. Rhoda has failed to provide plaintiffs with any HRH financial records, accounting

ledgers, profit and loss statements, expense reports, payment receipts, vendor invoices or any

other internal HRH documentation concerning the disposition of HRH funds, which were under

defendant's exclusive control for more than seven years.

70.     By letter dated August 18, 2014, HRH confirmed its termination of the Purported

Management Agreement on the basis of M. Rhoda's contractual breaches.

**Plaintiffs' Investigation of M. Rhoda's Misconduct**

71.     In light of the dispute between the parties and M. Rhoda's refusal to disclose HRH's financial records, beginning in February of 2014, plaintiffs commenced an investigation into M. Rhoda's conduct on Hilary's behalf dating back to 2007, when she first purported to act as Hilary's business manager and personal manager. As part of this investigation, plaintiffs retained, through their counsel, a forensic accounting firm to conduct an analysis of the available bank, credit card and tax records, in an effort to reconstruct, to the extent possible, Hilary and HRH's financial history.

72.     Plaintiffs' investigation identified numerous breaches of fiduciary duty and other defalcations by M. Rhoda, in addition to those identified above, that were previously unknown to Hilary, and are alleged below.

73.     In light of the results of plaintiffs' investigation, on or about March 11, 2014, M. Rhoda was formally removed as a director and officer of HRH, through a resolution signed by Hilary, acting as HRH's sole shareholder.

(i)  M. Rhoda's Forgery of Tax Documents and Mishandling of Tax Filings

74.     As part of their investigation, plaintiffs' accountants traveled to the offices of the accounting firm that M. Rhoda had employed for the preparation and filing of plaintiffs' tax returns for the 2007 through 2012 tax years (the "Prior Accountants"), in order to obtain copies of those tax filings and back-up and other documentation supporting those filings.

75.     While plaintiffs requested access to all files and documents associated with HRH and Hilary, the Prior Accountants were only able to provide plaintiffs' accountants with a portion of the relevant tax forms and filings for 2007 through 2012. For example, and without limitation, the Prior Accountants' files did not contain any e-file authorization forms for 2007 or

2008. Moreover, the Prior Accountants' files did not contain any back-up documentation - - such as internal accounting records, financial statements, receipts or invoices - - concerning the income and expense figures reported on the HRH tax returns and Hilary's personal tax returns.

76.     The Prior Accountants lacked any back-up documentation because M. Rhoda, whose responsibilities as Hilary's purported business manager included overseeing tax filings for Hilary and HRH (a Subchapter S Corporation), never provided such documents to the firm. Instead, on information and belief, M. Rhoda simply provided the Prior Accountants with hand-written sheets with aggregated income and expense figures or, in at least one year, provided such figures orally over the telephone, with no breakdown by relevant categories and no backup or supporting documentation.

77.     On information and belief, M. Rhoda often provided these bare figures to the Prior Accountants on or about the last possible day for filing tax returns, even with an extension. In 2007, M. Rhoda provided this information to the Prior Accountants several months *after* the extended tax filing deadline had passed, leading to the assessment against Hilary of more than $45,000 in late filing penalties. Similarly, the failure of M. Rhoda, who had assumed complete control over plaintiffs' financial affairs, to arrange for required quarterly tax payments - - instead making a single yearly payment - - resulted in additional fines and penalties being assessed by the IRS against Hilary. In exacerbation of the foregoing, M. Rhoda failed to make arrangements to timely and fully pay those fines and penalties from year to year, leading to even more, compounding fines and penalties being assessed against Hilary.

78.     In aggregate, as a result of M. Rhoda's late filings, failure to make quarterly tax payments and underpayment of taxes and fines, Hilary incurred tax fines and penalties in excess

19

of $75,000. Hilary was not aware of these penalties prior to the review of relevant documentation by plaintiffs' newly retained accountants.

79.     Plaintiffs' accountants also obtained from the Prior Accountants IRS e-filing authorization forms on which M. Rhoda had forged Hilary's signature, without Hilary's knowledge or authority. While such forms purported to affirm that Hilary had read and approved her tax returns prepared by the Prior Accountants, in fact neither M. Rhoda nor the Prior Accountants provided Hilary with copies of her tax returns prior to the filing of those returns. Instead, the Prior Accountants filed Hilary's tax returns pursuant to the fraudulent e-filing authorization forged by M. Rhoda in Hilary's name.

80.     On information and belief, M. Rhoda forged Hilary's name to the e-filing authorizations for each year of 2007 through 2012 as part of her efforts to maintain control over Hilary's finances and keep Hilary uninformed concerning the same.

(ii) Apparent Diversions of HRH Corporate Funds

81.     Despite the lack of HRH internal accounting records or back-up tax filing documentation, it is apparent from the HRH bank account records and credit card statements that M. Rhoda treated the HRH accounts as if they were her private piggy bank.

82.     Pursuant to the investigation conducted by plaintiffs' accountants, M. Rhoda appears to have diverted to her own benefit from HRH and, thus, from Hilary, far more than even the excessive 15% commission set forth in the Purported Management Agreement, through her exercise of complete dominion and control over the HRH accounts. Defendant accomplished these diversions of funds through a variety of financial machinations, including "counter withdrawals," wire transfers, checks written for personal expenses and the use of the HRH corporate credit card for personal expenses.

83.     On information an belief, M. Rhoda's unexplained and apparently improper diversions of HRH funds to her personal benefit include, without limitation, the following:

      a.  $1,000,000 in aggregate "counter withdrawals" from the HRH checking account in February and July of 2009, the use or destination of which cannot be determined from the bank records presently available to plaintiffs.

      b.  Wire transfers from the HRH checking and saving account totaling more than $1.19 million directed to various vendors and other accounts, including more than $675,000 to M. Rhoda's personal account and the remainder to vendors or other accounts with no apparent association to the business activities of HRH.  The latter group of transfers includes, without limitation, (1) more than $23,000 from the HRH checking account to the University of Pennsylvania, where M. Rhoda's son attended college; (2) more than $14,000 from the HRH checking account to a Swedish bank with which Hilary, to her knowledge, has no business relationship; and (3) more than $340,000 from the HRH savings account to an unknown account identified as a "loan" to an individual named Edmund J. Flynn, with whom Hilary is unfamiliar and has no business dealings.

      c.  The unaccounted for "withdrawal" of over $119,000 from a certificate of deposit that was purchased using funds from the HRH checking account.

      d.  Checks totaling over $250,000 written by M. Rhoda directly to vendors and service providers unassociated with the business activities of HRH, including, without limitation, M. Rhoda's divorce attorneys, pool vendor and a mortgage company, as well as various retail establishments, including Neiman Marcus, Barney's, P.C. Richards and Carpet Palace of Bethesda.

e.  Over $430,000 in credit card charges to M. Rhoda's HRH corporate credit card, a substantial portion of which were plainly used for defendant's personal expenses, including, without limitation, clothing purchases, auto repair, swimming pool maintenance, food purchases, pet related expenses and even a psychic.

f.  Nearly $120,000 charged to a corporate credit card issued to Hilary's older brother that, unbeknownst to Hilary, M. Rhoda paid using HRH funds.

84.   Despite repeated inquiries concerning the aforementioned transactions by plaintiffs, M. Rhoda has failed to explain how any of the foregoing relate to the business of HRH or Hilary.

(iii)  Unauthorized Allocation of Pension Funds

85.   In addition to the transactions described above, M. Rhoda diverted at least $1.8 million to her personal benefit through the unauthorized establishment, effective as of January 1, 2007, and subsequent funding of two HRH retirement plans, the HRH Group, Inc. Defined Benefit Plan (the "DB Plan") and the HRH Group, Inc. 401(k) Profit Sharing Plan (the "401(k) Plan") (collectively, the "Retirement Plans").

86.   As she had done with respect to the formation of HRH and the filing of Hilary's personal taxes, M. Rhoda established the retirement plans by forging Hilary's signatures to plan documentation.  Hilary did not authorize M. Rhoda to establish or fund the Retirement Plans.

87.   M. Rhoda, who was already purportedly acting as a dual fiduciary to Hilary, appointed herself as Trustee of the Retirement Plans and, in that capacity, caused in excess of $2 million of HRH funds to be transferred to the Plans.  In addition, and unbeknownst to Hilary, M. Rhoda purported to allocate a significant portion of those retirement funds to M. Rhoda's personal benefit.

22

88.     On information and belief, M. Rhoda established these two separate benefits plans, *i.e.*, the DB Plan and the 401(k) Plan, in an effort to maximize the amount of HRH funds that she could transfer to her own benefit.

89.     While Hilary eventually became aware of the existence of the Retirement Plans, she was unaware, until after the present dispute arose, that M. Rhoda had used those Plans as a vehicle to transfer HRH funds to M. Rhoda's benefit.

90.     In addition to the prior transfers of substantial HRH funds to the Retirement Plans, on or about February 5, 2014, immediately after Hilary had suggested that she and M. Rhoda terminate their professional relationship, M. Rhoda - - without Hilary's knowledge or consent - - caused an additional $650,000 of HRH funds to be transferred to the Retirement Plans, a substantial portion of which, on information and belief, defendant then allocated to her own benefit.  On information and belief, M. Rhoda transferred those funds in light of the disputes that had arisen between her and Hilary, in an improper effort to shield the portion of these HRH funds that she allocated to her own benefit from Hilary and HRH under applicable laws and regulations governing employer-sponsored retirement plans.

91.     On April 7, 2014, after plaintiffs had sent their allegations of fiduciary breaches and Notice of Default to M. Rhoda, HRH received a distribution request form from defendant dated March 10, 2014, which asserted a claim for a rollover of 100% of defendant's vested benefits under the Retirement Plan.  Through this request, M. Rhoda sought to remove the funds that she had allocated to her own benefit from the Retirement Plans, which were under the control of HRH, and transfer those funds to her personal custody and control.

92.     By letter dated June 6, 2014, HRH, as the "Plan Administrator" of the Retirement Plans, denied M. Rhoda's claims with respect to funds deposited into the Retirement Plans from

the HRH accounts. The bases for this denial included, *inter alia*, that M. Rhoda was ineligible for participation in the Plans as she was not a *bona fide* "employee" of HRH by virtue of her self-appointment as "Vice President," but acted, at most, in the capacity of an independent contractor as Hilary's supposed personal manager and business manager.

## COUNT I

### BREACH OF FIDUCIARY DUTY
**(Plaintiffs HRH Group, Inc. and Hilary Rhoda v. Defendant)**

93.     Plaintiffs incorporate by reference in their entirety the preceding paragraphs of this Complaint, as if fully set forth herein.

94.     In her dual roles as the business manager and personal manager of Hilary, M. Rhoda owed to Hilary strict (albeit conflicting) fiduciary duties.

95.     In addition, as the purported "Vice President" of HRH - - to the extent her fraudulent self-appointment to that position is legally cognizable - - M. Rhoda owed a strict fiduciary duty to plaintiff HRH.

96.     As alleged in detail above, M. Rhoda breached her fiduciary duties to plaintiffs, *inter alia*, by:

a.   purporting to act simultaneously in the conflicting roles of business manager and personal manager to Hilary and Vice President of HRH;

b.   inducing Hilary to sign the Purported Management Agreement without explaining its terms or suggesting that Hilary consult with an attorney, which inured to the substantial benefit of defendant, but was detrimental to Hilary's interests;

c.   failing to maintain and/or refusing to provide to plaintiffs accounting and financial records of HRH;

24

  d.  refusing to provide an accounting of the funds of plaintiffs that were controlled by M. Rhoda, including in respect of the compensation and other payments taken by M. Rhoda from HRH funds;

  e.  diverting HRH funds to her personal benefit without any lawful authority or legal basis to do so; and

  f.  causing Hilary to incur substantial tax penalties as a result of defendant's improper accounting and tax filing procedures.

97.  As a result of the foregoing breaches of fiduciary duty, defendant should be ordered to disgorge all compensation and other amounts paid to her by plaintiffs during the period that she acted faithlessly to plaintiffs - - *i.e.*, from at least as early as 2008 through the present.

98.  In addition to the disgorgement remedy sought above, plaintiffs have been damaged by defendant's aforesaid breaches of fiduciary duty in an amount to be determined at trial.

**COUNT II**

**CONVERSION**
**(Plaintiff HRH Group, Inc. v. Defendant)**

99.  Plaintiffs incorporate by reference in their entirety the preceding paragraphs of this Complaint, as if fully set forth herein.

100.  As alleged above, defendant converted substantial funds of HRH to her personal benefit without any authority or legal basis to do so.

101.  The total amount of defendant's conversion of HRH funds is presently unknown as a result of defendant's refusal to provide an accounting and requested documentation to plaintiffs, but, on information and belief, is substantially in excess of $1,000,000.

25

102.    HRH has been damaged by defendant's aforesaid conversion of HRH's funds in an amount to be determined at trial.

## COUNT III

### UNJUST ENRICHMENT
### (Plaintiff HRH Group, Inc. v. Defendant)

103.    Plaintiffs incorporate by reference in their entirety the preceding paragraphs of this Complaint, as if fully set forth herein.

104.    As alleged above, M. Rhoda has unjustly enriched herself, at the expense of HRH, through her diversion of HRH funds to her personal benefit.

105.    In equity and good conscience, defendant should be ordered to repay to HRH the amount that she has taken from that company.

106.    As a result of the foregoing, HRH seeks a judgment requiring defendant to reimburse it for defendant's unlawful diversions of company funds, in an amount to be determined at trial.

## COUNT IV

### FIDUCIARY ACCOUNTING
### (Plaintiffs HRH Group, Inc. and Hilary Rhoda v. Defendant)

107.    Plaintiffs incorporate by reference in their entirety the preceding paragraphs of this Complaint, as if fully set forth herein.

108.    As alleged above, defendant exerted sole and exclusive control over the bank accounts and credit card accounts of HRH.  In her purported role as Hilary's business manager and personal manager, and as a purported Vice President of HRH, defendant owed to Hilary and HRH strict and highly sensitive fiduciary duties with respect to each transaction that she undertook involving those accounts.

26

109.    Hilary repeatedly requested that defendant disclose to her the financial books and records of HRH and otherwise provide an accounting of the financial activities and transactions of Hilary and HRH, including, without limitation, all commissions, payments, expenses, reimbursement and other funds or consideration paid to defendant or any third parties in connection with Hilary's professional activities and the activities of HRH.

110.    Defendant refused to provide the requested documents and accounting.

111.    In light of the foregoing, HRH and Hilary respectfully request that this Court order defendant to provide a detailed accounting identifying and evidencing the financial activities and transactions of Hilary and HRH, including, without limitation, all commissions, payments, expenses, reimbursement and other funds or consideration paid to defendant or any third-parties in connection with Hilary's professional activities and the activities of HRH.

112.    To the extent that defendant cannot satisfy her burden in the context of such accounting to prove with contemporaneous records that each transaction in which she engaged in her capacity as plaintiffs' fiduciary was legitimately made on their behalf, plaintiffs respectfully request that the Court order defendant to reimburse them for each such transaction for which there exists such a failure of proof.

### COUNT V

### INJUNCTION
**(Plaintiff HRH Group, Inc. v. Defendant)**

113.    Plaintiffs incorporate by reference in their entirety the preceding paragraphs of this Complaint, as if fully set forth herein.

114.    As a result of her exclusive dominion and control over the finances and operations of HRH, defendant maintained sole possession of HRH's business records, which nonetheless were, at all times, and remain, the property of HRH.

115.    Upon defendant's termination as a director and officer of HRH, and the termination of the professional relationship between Hilary and defendant, M. Rhoda was required to transfer possession and control over the HRH books and records to Hilary, as sole remaining officer and director of HRH.

116.    Plaintiffs have repeatedly requested that defendant transfer to HRH the books and records of HRH within her possession or control, but she has failed to comply with that request.

117.    Plaintiff has no adequate remedy at law.

118.    As a result of the foregoing, HRH respectfully requests an injunction ordering defendant to provide to HRH all books and records of HRH within defendant's possession, custody or control, including, without limitation, all financial and tax records, corporate formation and governance documents, contracts (including all contracts concerning Hilary's professional activities) and corporate correspondence.

## COUNT VI

### DECLARATORY JUDGMENT – VOID AGREEMENT
**(Plaintiff HRH Group, Inc. v. Defendant)**

119.    Plaintiffs incorporate by reference in their entirety the preceding paragraphs of this Complaint, as if fully set forth herein.

120.    As alleged above, M. Rhoda induced Hilary to sign the Purported Management Agreement in derogation of her fiduciary duties to Hilary, including by failing to disclose the one-sided terms of the agreement inuring to M. Rhoda's substantial benefit, and by recommending that Hilary - - who was 23 years old at the time - - execute the agreement without consulting with an attorney or other disinterested professional.

121.    As the formation of the Purported Management Agreement is a direct result of this breach of fiduciary duty, the Purported Management Agreement is void and unenforceable as a matter of law.

122.    Defendant M. Rhoda has asserted that the Purported Management Agreement is valid and enforceable and has served a "Notice of Default" on "HRH Group, Inc., a/k/a Hilary Rhoda," ostensibly pursuant to that Agreement.

123.    As such, a legally cognizable and justiciable dispute exists between the parties concerning the validity and enforceability of the Purported Management Agreement.

124.    HRH respectfully requests a judicial declaration pursuant to 28 U.S.C. § 2201 and Rule 57 of the Federal Rules of Civil Procedure that the Purported Management Agreement is void and unenforceable as a result of defendant's inducement of Hilary to execute that agreement through multiple violations of defendant's fiduciary duties.

## COUNT VII

### BREACH OF CONTRACT (IN THE ALTERNATIVE)
### (Plaintiff HRH Group, Inc. v. Defendant)

125.    Plaintiffs incorporate by reference in their entirety the preceding paragraphs of this Complaint, as if fully set forth herein.

126.    In the alternative to the declaratory judgment sought in Count VI, above, but without waiver of or prejudice to the same, HRH asserts a claim for defendant's breaches of the terms and provisions of the Purported Management Agreement.

127.    M. Rhoda's breaches of the Purported Management Agreement result from, *inter alia,* her inability and/or refusal to meet her obligations set forth in paragraph 1 of that Agreement.

128.    In this regard, M. Rhoda breached the Purported Management Agreement, *inter alia*, by (1) failing to provide proper advice and counsel to Hilary concerning Hilary's career opportunities; (2) failing to negotiate Hilary's contracts; (3) failing to "hire, manage and control all other consultants" and other professionals representing Hilary; (4) failing to "develop, negotiate and administer" Hilary's "income producing opportunities"; and (5) failing to act as Hilary's "exclusive personal agent" in connection with Hilary's dramatic acting opportunities or her "product and trademark licensing" opportunities.  With respect to this final breach, defendant not only failed to provide the contractually mandated services, she was unable to do so as a matter of law, since she is not, and never has been, a licensed talent agent.

129.    As a result of the aforementioned breaches of the Management Agreement, Hilary has suffered damages in an amount to be determined at trial.

## COUNT VIII

### DECLARATORY JUDGMENT – TERMINATED AGREEMENT
### (IN THE ALTERNATIVE)
### (Plaintiff HRH Group, Inc. v. Defendant)

130.    Plaintiffs incorporate by reference in their entirety the preceding paragraphs of this Complaint, as if fully set forth herein.

131.    In the alternative to the declaratory judgment in Count VI, above, but without waiver of or prejudice to the same, HRH seeks a judicial declaration that the Proposed Management Agreement has been validly terminated.

132.    As a result of M. Rhoda's myriad breaches of the Purported Management Agreement, by letter dated August 18, 2014, plaintiffs confirmed the termination of that Agreement pursuant to the terms thereof.  M. Rhoda, in contrast, has not terminated the

Purported Management Agreement and has stated her supposed readiness to "perform her duties and responsibilities" under the Agreement, despite her prior failure to do so.

133.    On information and belief, M. Rhoda avers that the Purported Management Agreement has not been terminated and remains in full force and effect, an averment that HRH disputes.

134.    As a result, a legally cognizable and justiciable dispute exists between HRH and defendant concerning whether the Purported Management Agreement has been terminated.

135.    Plaintiffs respectfully request a judicial declaration pursuant to 28 U.S.C. § 2201 and Rule 57 of the Federal Rules of Civil Procedure that Purported Management Agreement has been validly terminated and is of no further legal force or effect.

## PRAYERS FOR RELIEF

WHEREFORE, based upon the foregoing allegations and averments, plaintiffs Hilary Rhoda and HRH Group, Inc. respectfully demand judgment against defendant Marianne K. Rhoda, as follows:

A.    Awarding plaintiffs compensatory damages in an amount to be determined at trial;

B.    Awarding plaintiffs punitive or exemplary damages in an amount to be determined at trial;

C.    Enjoining defendant Marianne Rhoda from acting or purporting to act as a business manager, personal manager or in any other professional capacity on behalf of plaintiff Hilary Rhoda;

D.    Enjoining defendant Marianne Rhoda from acting or purporting to act as an employee, officer or director of plaintiff HRH Group, Inc., or in any other capacity on behalf of that corporation;

E.    Declaring the Purported Management Agreement void *ab initio* and unenforceable as a matter of law or, in the alternative, declaring the Purported Management Agreement properly terminated by plaintiffs and of no further force and effect;

F.    Ordering defendant to provide a detailed accounting to plaintiffs of all financial activities and transactions of plaintiff Hilary Rhoda and HRH Group, Inc., including, without limitation, all commissions, salary, reimbursements and any other income, funds or items of value received by defendant at any time from, by reason of or as a result of plaintiffs' business and professional activities;

G.    Ordering defendant to provide to plaintiff HRH Group, Inc. all books and records of HRH Group, Inc. in defendant's possession, custody or control, including, without limitation, all internal accounting journals, account records, financial statements, invoices, receipts, corporate formation and governance documents, contracts, tax forms and records and corporate correspondence;

H.    Awarding plaintiffs their attorney's fees and costs incurred in connection with this action; and

I.    Granting such other and further relief as this Court deems just and appropriate.


## JURY DEMAND

Plaintiffs demand a trial by jury on all issues and claims so triable.

Dated:   August 20, 2014
         New York, New York


ROSENBERG & GIGER P.C.

By: _____
John J. Rosenberg
Matthew H. Giger
Brett T. Perala
250 Park Avenue, 12th Floor
New York, NY  10177
(646) 494-5050

*Attorneys for Plaintiffs*