UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____x

HILARY RHODA, HRH GROUP, INC.,

      Plaintiffs and Counterclaim Defendants,        No. 14 Civ. 6740 (CM)

     -against-

MARIANNE K. RHODA,

      Defendant and Counterclaim Plaintiff.

_____x

*USDC SDNY*
*DOCUMENT*
*ELECTRONICALLY FILED*
*DOC #:_____*
*DATE FILED: 6/22/17*

## DECISION AND ORDER GRANTING DEFENDANT'S MOTION TO ADD COUNTERCLAIM DEFENDANT AND TO AMEND THE PLEADINGS, DENYING DEFENDANT'S MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS, AND DENYING THE PARTIES' CROSS-MOTIONS FOR PARTIAL SUMMARY JUDGMENT

McMahon, C.J.:

When business relationships go south, lawsuits follow.

When the business partners are members of the same family, those lawsuits can get ugly very quickly.

This particular ugly lawsuit resulted from the soured business relationship between a now-estranged parent and child – Plaintiff Hilary Rhoda, supermodel and the former "face of Estée Lauder," and her business manager-mother, Defendant Marianne Rhoda. Hilary alleges that her mother used the "furnishing company" through which Hilary pursued her professional modeling activities, Plaintiff HRH Group, Inc. ("HRH"), as a personal "piggy bank" to fund her extravagant lifestyle and to pay the bills of third parties, including her parents, boyfriend, and son.

1

Marianne counters that Hilary and HRH have underpaid her for her years of work taking care of her daughter's finances and have refused to adhere to the terms of their management contract to the end of its stated term. She also claims that HRH arbitrarily and capriciously denied benefits owed to her under the company's employee benefit plans, both of which are governed by the Employee Retirement Income Security Act of 1974 ("ERISA").

The instant lawsuit was filed after the business relationship between the two women ruptured in February 2014. Presently pending are four motions: (1) Marianne's motion to add a Counterclaim Defendant and to amend the pleadings to add a counterclaim; (2) Plaintiffs' motion for partial summary judgment on their claim that Marianne breached her fiduciary duties to them and (3) Marianne's cross-motion for partial judgment on the pleadings as to that same claim; and (4) Marianne's cross-motion for partial summary judgment on an ERISA-related counterclaim.

The four motions are disposed of as follows.

## BACKGROUND[1]

### 1. Hilary's Early Career

Hilary began her modeling career in 2003, while she was a sophomore in high school. (Giger Decl., Ex. A (M. Rhoda Dep. 52:15-19), Dkt. No. 125.) At that time, Click Models, a modeling agency located in New York City, represented her. (H. Rhoda Decl. ¶ 3, Dkt. No. 123.) During this time, Marianne often accompanied Hilary to photoshoots and meetings. (H. Rhoda Decl. ¶ 3, Dkt. No. 142.)

---

[1] The facts are drawn from Defendant's Rule 56.1 Statement of Undisputed Material Facts (Dkt. No. 117), Plaintiffs' Rule 56.1 Statement of Undisputed Material Facts (Dkt. No. 126), Plaintiffs' Rule 56.1 Counter-Statement of Undisputed Material Facts (Dkt. No. 145), Defendant's Rule 56.1 Counter-Statement of Undisputed Facts (Dkt. No. 151), and the declarations and exhibits filed in support of the instant motions. Unless otherwise noted, these facts are not in dispute.

In 2005, after Hilary graduated from high school in Chevy Chase, Maryland, she moved to New York City to pursue her modeling career full-time. (M. Rhoda Dep. 543:6-13.)

## 2. Hilary's Relationship with IMG

Shortly after her move to New York City in 2005, Hilary became a client of IMG Models ("IMG"), an international modeling agency. (H. Rhoda Decl. ¶ 5, Dkt. No. 142; M. Rhoda Dep. 552:17-21.) According to Hilary, IMG represented her "in virtually all aspects of [her] career." (H. Rhoda Decl. ¶ 5, Dkt. No. 142.)

Although Plaintiffs indicate that IMG began to represent Hilary in 2005, the record only contains one contract between Hilary and IMG, which was effective from February 9, 2007 to February 8, 2010. (Ehrenberg Decl., Ex. 7, Dkt. No. 118.)

The contract does not provide for more than one one-year renewal:

(a) The "Management Period" of this agreement commences on the "Effective Date" above, continues until February 8, 2010 and automatically renews for a further one (1) year period unless either party gives written notice of termination to the other by certified mail at least thirty (30) days before February 8, 2010.

(*Id.*) The Court cannot locate any more recent IMG contract in the record.

As compensation for IMG's services, the contract provided as follows:

Compensation Terms. (a) In consideration for IMG Models' services, Company will pay IMG Models a commission percentage of the gross income paid by customers of Hilary to Company or Hilary (the "Income"), for Hilary's services and for the use of MODEL Identification under:

(i)      agreements entered into during the Management Period;

(ii)      agreements entered into the Management Period which are substantially negotiated during the Management Period . . . ;

(iii)      any renewals, re-uses, extensions, substitutions, modifications and/or amendments of any agreement described in (i) and (ii) immediately above, which . . . occur after expiration of the Management Period . . . or the earlier termination of this Agreement ("post-Management Term third party agreements"), subject to the

3

following limitations. The commission rate on commissions due to IMG Models hereunder for post-Management Term third party Agreements, shall except as otherwise set forth in Paragraph 2(c)(iii) hereinafter, be based upon the commission rates in effect under this Agreement at the end of the Management Period or the earlier termination of this Agreement. Commissions shall be due only for the period set forth hereinafter:

    (A)    IMG Models shall be entitled to full commission on income earned during the first two (2) years of any post-Management Term third-party Agreements with any particular customer;

    (B)    IMG Models shall be entitled to one-half commission on income earned during the next three (3) years of any post-Management Term third-party Agreements with any particular customer;

    (C)    IMG Models shall not be entitled to any commission on income earned after five (5) years from any post-Management Term third-party Agreements with any particular customer.

Income shall mean and include amounts which are payable with respect to the Management Period and with respect to any period after the Management Period. Commissions are due when Income is received by or on behalf of Hilary, directly or indirectly.

(b) Company must pay IMG Models the commission within thirty (30) days of when the customer pays Company or Hilary Income.

(c) (i) Except as set forth under (ii) and (iii) below, the Commission rates for Income paid under Agreements with Deal Initiation Dates on or after February 9, 2007 and under the Agreement of January 18, 2007 with Estee Lauder (the "EL Agreement") . . . are set forth in the following schedule:

SCHEDULE

| | | |
|---|---|---|
| Modeling, Endorsements and Personal Appearances | | 10% |
| Publishing | | 10% |
| Appearances as a host, commentator or on-screen personality in electronic media, including television | | 10% |

(*Id.*) The contract provides that payments will be made as follows:

(ii)     When Company seeks direct payment and for the Agreement with Estee Lauder of January 18, 2007, Company will deliver to Estee Lauder and to other customers of Company or Hilary's when requested by IMG Models a letter in the form attached as Exhibit A.

(iii)    In all other instances, Company agrees that the customer will pay all Income directly to IMG models. In those cases, IMG Models shall invoice the customer within thirty (30) days . . . . When IMG Models receives such payment, IMG Models agrees to promptly pay the balance of Income to Company after deducting allowable amounts due to IMG Models as defined below.

(*Id.*)

The IMG contract designates Marianne as Hilary's business manager: "In all matters related to Hilary's management hereunder, Company designates Marianne Rhoda to serve as Hilary's business manager . . . ." (*Id.*)

### 3.  2005 Manager Agreement

Also in 2005, Marianne began to act as Hilary's manager. (H. Rhoda Decl. ¶ 6, Dkt. No. 142.) According to Hilary, although her mother assumed the role of "manager" at that time, she continued to engage in the same tasks and activities that she had undertaken as when the two had only a familial relationship. (*Id.*) In Marianne's view, Hilary formalized a business relationship with her in 2005. (M. Rhoda Decl. ¶ 2, Dkt. No. 152.)

On November 12, 2005, Hilary and Marianne signed a contract (the "2005 Manager Agreement") that appointed Marianne as Hilary's business manager. (Giger Decl., Ex. E, Dkt. No. 144.) Hilary was 18 years old at the time. According to Marianne, Hilary had provided input and agreed to the contract's terms before signing it. (M. Rhoda Decl. ¶ 2, Dkt. No. 152.) Plaintiffs dispute this fact. They assert that Hilary provided no input into the 2005 Manager Agreement.

5

The contract outlined Marianne's responsibilities as a business manager. These responsibilities included providing advice on Hilary's career opportunities, developing and managing Hilary's portfolio and presenting it to members of the modeling and advertising industry, and refining Hilary's personal appearance. (Giger Decl., Ex. E, Dkt. No. 144.) They also included reviewing and negotiating all contracts presented by IMG and/or any subsequent agency. Marianne was additionally responsible for "assist[ing] along with specialists including attorneys, accountants and/or financial advisers in the payment of federal income taxes, state income taxes, employment insurance, social security as well as assisting in the obtaining of health, accident and/or disability insurance." (*Id.*)

Finally, Marianne was granted authority "to create and maintain bank accounts, corporate documents, and other business issues involving the receipt of payments to Hilary Rhoda and/or to her corporation, should she choose to incorporate." (*Id.*)

The 2005 Manager Agreement contained several provisions regarding who should bear the costs of business-related expenses. In particular, the contract provides that "all out-of-pocket expenses (travel, room and board, etc.) for Marianne Rhoda, personally, that have not otherwise been paid for by the client of IMG Models, Inc. or any subsequent agency hired to represent the interests of Hilary Rhoda, shall be the responsibility of Marianne Rhoda." (*Id.*) However, "All expenses incurred in the hiring of attorneys, accountants, financial advisers, and any other professional or quasi-professional etc., hired to assist in any of the aforesaid endeavors shall be paid by Hilary Rhoda and not Marianne Rhoda. If any sums have been, or are in the future, expended by Marianne Rhoda they are to be repaid to her by Hilary Rhoda." (*Id.*)

With respect to Marianne's compensation for serving as Hilary's business manager, the 2005 Manager Agreement provided:

6

2.  (a) In consideration for the aforesaid services, Hilary Rhoda agrees to pay, and Marianne Rhoda agrees to accept, a 15% commission of Hilary Rhoda's gross receipts from [endeavors related to (a) modeling; (b) merchandising, licensing and endorsement; (c) personal appearances, (d) publishing; and (e) television appearances as a host, commentator or on-screen personality] and will continue to pay said sums for the term of this contract.

(b) The commission will be paid upon receipt of said sums from IMG Models, Inc., or a subsequent agency hired to represent the interests of Hilary Rhoda.

(*Id.*)

Finally, the 2005 contract contains a Maryland choice-of-law provision and a provision requiring that disputes arising under the contract be first referred to mediation in Maryland:

Any dispute, claim or controversy arising out of or relating to this Agreement or between IMG Models and me will be first referred to non-binding and confidential mediation administered in the State of Maryland . . . . Any dispute claim or controversy which cannot be remedied by mediation will be adjudicated by a court of competent jurisdiction in the state of Maryland.

This Agreement is to be controlled by the laws of the State of Maryland . . . .

(*Id.*)

### 4.  Formation of HRH

In early 2007, Hilary signed an exclusive contract to act as a model and spokesperson for Estée Lauder. (H. Rhoda Decl. ¶ 7, Dkt. No. 123.) The contract with Estée Lauder was the most significant modeling contract that Hilary had obtained up to that point in her career. (*Id.*) Shortly after Hilary entered into this contract, Marianne formed HRH, a "furnishing company" that entered into contracts on Hilary's behalf for her modeling services. (*Id.* ¶ 8.)

HRH was incorporated in Virginia. According to Marianne, it was formed to minimize Hilary's tax exposure. (M. Rhoda Dep. 191:8-12; M. Rhoda Decl. ¶¶ 4-6, Dkt. No. 152.) Marianne testified that she and Hilary discussed the formation of HRH prior to its incorporation and that Hilary wanted to form the company. (M. Rhoda Decl. ¶ 5, Dkt. No. 152.)

7

Marianne engaged a Virginia law firm, SmolenPlevy, to advise her on HRH's incorporation and to draft all corporate documents. (*Id.*) Marianne signed the corporate formation documents; she also signed Hilary's name to them. (M. Rhoda Dep. 207:11-209:11; M. Rhoda Decl. ¶ 7, Dkt. No. 152.) Marianne claims she did this with Hilary's consent. (*Id.*) Plaintiffs, on the other hand, insist that Hilary's signature was forged by Marianne. (Pls.' Rule 56.1 Statement ¶ 12.)

The corporate formation documents designated Hilary as HRH's President, Secretary, Treasurer, and sole shareholder. (Pls.' Rule 56.1 Statement ¶ 5; M. Rhoda Decl. ¶ 7, Dkt. No. 152.) They designated Marianne as the company's Vice President and as a director. (M. Rhoda Decl. ¶ 7, Dkt. No. 152.) Marianne claims that both she and Hilary spoke to an attorney at SmolenPlevy over the phone to discuss their corporate roles prior to the time that the corporate formation documents were signed. (*Id.*)

In 2007, after HRH's formation, Marianne opened a corporate checking account and a corporate savings account at Bank of America. (M. Rhoda Dep. 258:23-259:2, 451:9-11; M. Rhoda Decl. ¶ 8, Dkt. No. 152.) Marianne had signatory power over the checking account and the authority to transfer funds to and from both the HRH checking and savings accounts. (Def.'s Rule 56.1 Counterstatement ¶¶ 20-21.) According to Marianne, Hilary had the ability to, and did, write checks from the HRH checking account. (M. Rhoda Decl. ¶ 8, Dkt. No. 152.) In 2007, Marianne converted her personal American Express credit card account to an HRH credit card account. (*Id.* ¶ 9.) According to Marianne, Hilary was unable to obtain a credit card at the time. (*Id.*)

### 5.  2010 Manager Agreement

In November 2010, Hilary's Estée Lauder agreement was renewed. According to Hilary,

shortly after the renewal, Marianne invited Hilary to her Manhattan apartment for a social visit.

(H. Rhoda Decl. ¶ 12, Dkt No. 123.) During that visit, Marianne asked Hilary to sign an

agreement re-appointing Marianne as Hilary's business manager (the "2010 Manager

Agreement"). (*Id.*) Hilary was 23 years old at the time. (*Id.*)

The agreement was prepared by Marianne with the assistance of her boyfriend, Anthony

Newman, who is an attorney. (M. Rhoda Dep. 626:7-630:17; Giger Decl., Ex. C (Newman Dep.

178:20-179:7), Dkt. No. 125.) Although Marianne disputes this fact, Hilary claims that she did

not see the contract or discuss it with anyone prior to the time that she was asked to sign it. (H.

Rhoda Decl. ¶ 12, Dkt. No. 123; M. Rhoda Decl. ¶ 10, Dkt. No. 152.) Hilary testified that she

signed the contract without reviewing its terms and without seeking legal advice. (H. Rhoda

Decl. ¶ 12, Dkt. No. 123.)

The 2010 Manager Agreement re-appointed Marianne as Hilary's business manager for a

term ending on November 30, 2016 (the "2010 Manager Agreement"). (Giger Decl., Ex. F, Dkt.

No. 144.) In addition to acting as Hilary's "business manager," the agreement also provided that

Marianne would act as Hilary's "individual manager." (*Id.*) The contract states that it is an

agreement "between Marianne K. Rhoda and HRH Group, Inc., a/k/a Hilary Rhoda." (*Id.*)

The 2010 Manager Agreement, like the 2005 Manager Agreement, spells out Marianne's

responsibilities as a business and individual manager. These responsibilities include providing

advice on Hilary's career opportunities, developing and managing Hilary's portfolio, and

refining Hilary's personal appearance. (*Id.*) They also included reviewing and negotiating all

contracts between HRH and/or Hilary and any other person and entity, including but not limited

9

to contracts with IMG and its clients, like Estée Lauder. (*Id.*) Marianne was also responsible for

hiring and managing other HRH employees and/or independent contractors, including "attorneys,

accountants, clerical persons, public relations consultants, acting agencies, etc." (*Id.*)

Finally, the 2010 Manager Agreement granted Marianne authority over the finances of

HRH, including the right to:

> maintain and control accounts for the deposit of all income received by HRH Inc., and/or
> Hilary Rhoda; review, examine, [sic] billing documents including: receipts for payment,
> receipts for the repayment of expenses, invoices and any and all other documents relating
> in any [sic] to Company; and, distribute all salary/compensation to [third party agents and
> employees], as well as Marianne K. Rhoda and Hilary Rhoda.

(*Id.*)

> With respect to Marianne's compensation, the agreement provided:

> Compensation Terms. (a) In consideration for Marianne K. Rhoda's services, Company
> will pay Marianne K. Rhoda, Fifteen (15%) Percent as a commission percentage of the
> gross income (the "Income"), received by the Company, and/or Hilary Rhoda, for
> Hilary's services under:

>> (i)      all agreements entered into the Business Management Period (which
>>          beginning in January 1, 2005);

>> (ii)     agreements entered into after the Business Management Period which are
>>          substantially negotiated during the Business Management Period . . . ; and

>> (iii)    any renewals, re-uses, extensions, substitutions, modifications and/or
>>          amendments of any agreement described in (i) and (ii) immediately above
>>          . . . .

>> (iv)     The commissions shall continue into any post management period in the
>>          same amount as the business management period (Fifteen (15%) Percent)
>>          and shall continue past the business management period for a term of no
>>          less than five (5) years.

> Notwithstanding anything to the contrary set forth elsewhere in this Agreement, the
> Commission rate for Income received by Company from Estee Lauder (15%) ("EL"),
> shall continue in perpetuities for any period thatthe [sic] Company, and/or Hilary Rhoda
> is in contract with EL.

(*Id.*)

> The 2010 Manager Agreement contains a Maryland choice-of law provision that states:

> This Agreement shall be deemed to have been made under and shall be governed by, the Laws of the State of Maryland applicable thereto including matters of construction, validity and performance without regard to the principles of Conflict of Laws.

(*Id.*)

### 6.  Formation of HRH's Employee Benefit Plans

On June 4, 2007, Marianne established two HRH-sponsored employee benefit plans – the HRH Group, Inc. Defined Benefit Plan ("Defined Benefit Plan") and the HRH Group, Inc. 401(k) Plan ("401(k) Plan") (collectively, "the Plans"). (H. Rhoda Decl. ¶ 13, Dkt. No. 142.)

### i.  Defined Benefit Plan

According to Marianne, she engaged Thomas Barret of the National Employers Retirement Trust Associates ("NERT") to create the Defined Benefit Plan. (M. Rhoda Decl. ¶ 12, Dkt. No. 152.)  SmolenPlevy, the law firm that assisted with HRH's incorporation process, prepared corporate resolutions approving adoption of the Plans. (*Id.*) Corporate and tax attorneys at SmolenPlevy and Barrett advised Marianne to establish the Defined Benefit Plan, as well as the 401(k) Plan, in order to minimize taxes for Hilary and HRH. (*Id.*) Marianne signed the plan adoption papers as the Vice President of HRH, as the individual trustee for the plan, and as HRH's Secretary certifying that the Board of Directors had authorized adoption of the plan. (Ehrenberg Decl., Ex. 3, Dkt. No. 118.) Hilary asserts that she did not approve the adoption of the plan or sign any of the adoption papers. (H. Rhoda Decl. ¶ 16, Dkt. No. 142.) Hilary also did not sign the certificate of board resolutions authorizing adoption of the Defined Benefit Plan or any of the amendments to that plan. (Ehrenberg Decl., Ex. 3, Dkt. No. 118.)

11

Marianne amended and restated the Defined Benefit Plan on January 1, 2012. (Pls.' 56.1 Counter-Statement ¶ 9.) Again, Marianne signed the plan amendment documents and certified that the Board of Directors approved by resolution the adoption of the Defined Benefit Plan restatement. (Ehrenberg Decl., Ex. 4, Dkt. No. 118.) Hilary says that did not authorize the amendment and did not sign any of the documents that amended the plan. (Pls.' 56.1 Counter-Statement ¶ 9; Ehrenberg Decl., Ex. 4, Dkt. No. 118.)

The Defined Benefit Plan allows a participant who is eligible for the normal retirement benefit to receive "10% of the Participant's Average Annual Earnings multiplied by the number of his years of Credited Service at retirement not in excess of 10 years." (Ehrenberg Decl., Ex. 4 § 1.4, Dkt. No. 118.) A terminated participant's benefit is the accrued benefit on the date of the termination (*Id.* § 1.8.)

With respect to eligibility, the 2007 version of the Defined Benefit Plan states that an "Employee" eligible to participate is "any person reported on the payroll records of the Employer as an employee and who is deemed by the Employer to be a common law employee." (Ehrenberg Decl., Ex. 2 § 1.19, Dkt. No. 118.) "Persons not deemed by the Employer to be Employees but who instead are deemed to be independent contractors are not eligible." (Ehrenberg Decl., Ex. 3 § 2.4, Dkt. No. 118.) Finally, the 2007 version of the plan states, "All Employees known as Marianne Rhoda are Eligible Employees . . . ."

The 2012 version of the Defined Benefit Plan similarly contains a provision that deems Marianne to be an eligible employee but additionally contains an exemption to her eligibility:

> The term Covered Employee means all Employees known as Marianne Rhoda are Eligible Employees. Notwithstanding the foregoing, the term "Covered Employee" shall not include the following: (a) any individual with respect to whom the Employer does not withhold income or employment taxes and file Form W-2 (or any replacement Form) with the Internal Revenue Service because such individual has executed a contract, letter

of agreement, or other document acknowledging his status as an independent contractor, even if such individual is later adjudicated to be a common law employee of the Employer, unless and until the Employer extends coverage to such individual . . . .

(Ehrenberg Decl., Ex. 4 § 2.11, Dkt. No. 118.)

Under both the 2007 and 2012 versions of the Defined Benefit Plan, an eligible employee must be at least 21 years old and have completed at least 1,000 hours of service within a 12-month period. (Ehrenberg Decl., Ex. 3 § 2.1, Ex. 4 § 5.1, Dkt. No. 118.) However, under the 2007 version of the plan, "the Administrator may elect . . . to apply one or more of the following equivalency methods in determining the Hours of Service of an Employee paid on an hourly or salaried basis:"

(a) 190 Hours of Service for each month in which he or she is paid or entitled to payment for at least one Hour of Service; or (b) 95 Hours of Service for each semi-monthly payment period in which he or she is paid or entitled to payment for at least one Hour of Service; or (c) 45 Hours of Service for each week in which he or she is paid or entitled to payment for at least one Hour of Service; or (d) 10 Hours of Service for each day in which he or she is paid or entitled to payment for at least one Hour of Service.

(Ehrenberg Decl., Ex. 2 § 1.26, Dkt. No. 118.)

Under the 2012 amended Defined Benefit Plan, "if an Employer does not maintain records that accurately reflect actual hours of service with respect to a Covered Employee, the Employer shall credit Hours of Service" in accordance with one of the equivalency methods described above. (Ehrenberg Decl., Ex. 2 § 3.2, Dkt. No. 118.)

Both the 2007 and 2012 versions of the Defined Benefit Plan grants discretion to the administrator the authority to interpret the plan and to make benefits determinations:

The Sponsor, which shall be the administrator for purposes of ERISA and the Plan Administrator . . . shall have all the powers and authority expressly conferred upon it herein and shall have the sole discretionary right, authority, and power to interpret and construe the Plan, and to determine any disputes arising thereunder . . . . Any interpretation of Plan provisions and any findings of fact, including eligibility to participate and eligibility for benefits, made by the Sponsor (or any named fiduciary to

13

whom the Sponsor has allocated authority to make such interpretations and findings of fact) are final and will not be subject to "de novo" review unless shown to be arbitrary and capricious.

(Ehrenberg Decl., Ex. 4 § 15.1, Dkt. No. 118; *see also* Ehrenberg Decl., Ex. 2 §§ 8.2, 8.4, Dkt. No. 118.)

### ii.   401(k) Plan

Marianne established the 401(k) Plan on June 4, 2007 – the same day that she established the Defined Benefit Plan. Barrett and attorneys at SmolenPlevy also assisted with the formation of the 401(k) Plan. (M. Rhoda Decl. ¶ 12, Dkt. No. 152.) As with the Defined Benefit Plan, Marianne signed all the plan adoption documents for the 401(k) Plan.

Hilary contends that she did not approve the adoption of the 401(k) Plan, and that she did not sign any of the plan adoption documents or the certificate of board resolutions authorizing the adoption of the plan or its amendments. (H. Rhoda Decl. ¶ 13, Dkt. No. 142; Ehrenberg Decl., Ex. 5, Ex. 6, Dkt. No. 118.)

The 401(k) Plan permits HRH to withhold all or a portion of a participant's compensation to contribute to the plan on behalf of the participant. (Ehrenberg Decl., Ex. 5 § 3.2, Dkt. No. 118.) The plan also permits HRH to provide matching contributions. However, it designates that the matching contributions will be made pursuant to a "totally discretionary formula." (Ehrenberg Decl., Ex. 6 § 5.1, Dkt. No. 118.) Under this formula, HRH has the discretion to "establish the amount of the contributions, the rate of the match, as well as the [maximum matching contribution per participant]." (Ehrenberg Decl., Ex. 5 § 3.4(f), Dkt. No. 118.) Additionally, the 401(k) Plan permits HRH to make "totally discretionary" non-elective contributions to the plan, which are allocated pro rata based on the compensation of all benefiting participants. (Ehrenberg Decl., Ex. 6 §§ 7.1, 7.2, Dkt. No. 118.)

14

A terminated participant "will be entitled to his or her Vested Aggregate Account

balance as of the most recent Valuation Date coinciding with or immediately preceding the date

of distribution." (Ehrenberg Decl., Ex. 5 § 4.5, Dkt. No. 118.)

The 401(k) Plan provides full vesting of benefits in certain accounts:

> A Participant will at all times have a 100% Vested Interest in his or her Elective Deferral
> Account, ADP Safe Harbor Non-Elective Contribution Account, ADP Safe Harbor
> Matching Contribution Account, Qualified Matching Contribution Account, Qualified
> Non-Elective Contribution Account, Voluntary Employee Contribution Account,
> Mandatory Employee Contribution Account and Deemed IRA Contribution Account.

(Ehrenberg Decl., Ex. 5 § 4.6(b), Dkt. No. 118.) A participant's vested interest in all employer

contribution accounts not specified above is determined according to a vesting schedule. (*Id.*

§ 4.6(c).)

With respect to eligibility, the 401(k) Plan states that an "Eligible Employee" is "any

Employee who is a member of an eligible class of Employees and who is not excluded from

participating in the Plan . . . as elected by the Sponsoring Employer in the Adoption Agreement."

(Ehrenberg Decl., Ex. 5, § 1.64, Dkt. No. 118.) The term "Employee" means:

> (a) [A]ny person who is reported on the payroll records of the Employer as an employee
> and who is deemed by the Employer to be a common law employee; (b) any person who
> is reported on the payroll records of an Affiliated Employer as an employee and who is
> deemed by the Affiliated Employer to be a common law employee of the Affiliated
> employer . . . (c) any Self-Employed Individual who derives Earned Income from the
> Employer; and (d) any person who is considered a Leased Employee . . . However, the
> term 'Employee' will not include an Independent Contractor.

(Ehrenberg Decl., Ex. 5 § 1.65, Dkt. No. 118.) The plan's Adoption Agreement states that "any

individual who is deemed by the Employer to be an independent contractor" is ineligible to

participate. (Ehrenberg Decl., Ex. 6 at 5, Dkt. No. 118.)

The term "independent contractor" is itself defined in the 401(k) Plan as: "[A]ny

individual who is not reported on the payroll records of the Employer or an Affiliated Employer

as a common law employee. The determination of whether an individual is an Independent

Contractor will be based on the facts and circumstances and upon the guidance of Revenue

Ruling 87-41." (Ehrenberg Decl., Ex. 5 § 1.88, Dkt. No. 118.)

The 401(k) Plan does not contain any provision stating that Marianne Rhoda is deemed

to be an eligible employee.

Like the Defined Benefit Plan, participation in the 401(k) Plan requires Eligible

Employees to be 21 years old and to complete 1,000 hours of service each year in which they

claim benefits. The administrator may elect to calculate the hours of service using the same

equivalency method described in the Defined Benefit Plan. (Ehrenberg Decl., Ex. 5, §§ 1.85(c),

2.1, Dkt. No. 118.)

The 401(k) Plan grants the Administrator significant discretion:

> The powers and duties of the Administrator include . . . construing and resolving any
> question of Plan administration . . . and making any findings of fact the Administrator
> deems necessary to proper Plan administration. Notwithstanding any contrary provision
> of this Plan, benefits under this Plan will be paid only if the Administrator decides in its
> discretion that the applicant is entitled to them. The Administrator's interpretation of
> Plans provisions, and any findings of facts, including eligibility to participate and
> eligibility for benefits, are final and will not be subject to "de novo" review unless shown
> to be arbitrary and capricious.

(*Id.* § 8.2.)

### iii.    Marianne's Contributions to Plans

Plaintiffs claim that Marianne, without Hilary's consent, designated both herself and

Hilary as participants in the Defined Benefit Plan and the 401(k) Plan. (Pls.' 56.1 Counter-

Statement ¶ 27.) Marianne asserts that she created the Plans in order to create tax benefits for

HRH and that in order for the company to receive those benefits, the Plans had to cover at least

one other employee other than Hilary, HRH's sole shareholder. (Def.'s Mem. in Opp'n at 2, Dkt.

16

No. 102.) Thus, Marianne included and specifically named herself as a participant in the Plans. (*Id.*)

Marianne rolled over funds from her prior employer's retirement plans into the Defined Benefit Plan and the 401(k) Plan. (M. Rhoda Dep. 173:14-18.) However, she also admitted that she transferred HRH funds to the Plans in her name that were in addition to her commissions. (M. Rhoda Dep. 185:21-186:8.)

Although Hilary states that she did not approve any company-sponsored employee benefit or retirement plan, she was aware that Marianne had created an HRH retirement plan. (H. Rhoda Decl. ¶¶ 14, 16, Dkt. No. 142.) However, according to Hilary, Marianne told her that the plan was established exclusively for Hilary's benefit; Marianne did not tell Hilary that Marianne herself would participate in the plan. (*Id.*) Marianne made all transfers to the Plans; Hilary did not make any deposits or transfers to the Plans. (*Id.* ¶ 17.) Hilary believed that she would be the beneficiary of all funds that Marianne transferred into the HRH retirement plans. (*Id.* ¶ 15.)

Marianne tells a different version of the events. According to Marianne, Hilary was aware that Marianne established the Plans and that both of them were entitled to participate in the Plans as HRH employees. (M. Rhoda Decl. ¶ 12, Dkt. No. 152.) In Marianne's account, Hilary was aware that Marianne made contributions to the Plans, on behalf of both Hilary and herself. (*Id.*) Marianne listed Hilary as the beneficiary of Marianne's benefits in the event of death. (*Id.*)

Hilary does not remember receiving or reviewing, prior to firing Marianne, any documents indicating that Marianne was a participant in an HRH retirement plan or that Marianne claimed any entitlement to funds deposited in the HRH retirement plan. (H. Rhoda Decl. ¶ 18, Dkt. No. 142.) In fact, Hilary asserts that she had not seen many of the ERISA plan

17

formation documents until discovery in this litigation. (*Id.* ¶ 13.) Moreover, Hilary testified that Barrett of NERT, the third-party administrator of the HRH retirement plans, never once communicated with her prior to the time that she fired her mother in February 2014.

The accountant who handled tax preparation matters for HRH, Shaundri Saint-Louis, testified at her deposition that Marianne represented to her that, although funds would be contributed to the 401(k) Plan in Marianne's name, Hilary would ultimately be the beneficiary of these funds. According to Saint-Louis, Marianne represented that the 401(k) Plan was established solely for Hilary's benefit, and not for Marianne's own benefit. (Giger Decl., Ex. C (Saint-Louis Dep. 454:20-455:6), Dkt. No. 144.)

Hilary signed Forms 5500 – an annual IRS form for employee benefit plans – for both the Defined Benefit Plan and 401(k) Plan in 2013 and 2014. The signed forms for those years state that there are two plan participants in HRH's ERISA plans.[2] (Pls.' 56.1 Counter-Statement ¶ 56.) However, Plaintiffs claim that Hilary signed the documents in order "to maintain the *status quo* created by M. Rhoda when she established the Plans . . . pending a determination by his Court of the present dispute concerning whether M. Rhoda was an eligible employee entitled to participate in the Plans." (*Id.*) Hilary asserts that the 2013 and 2014 Forms 5500 were submitted for the purpose of ensuring that Marianne's ERISA-based counterclaim was not adversely affected pending adjudication of the claim. (H. Rhoda Decl. ¶ 27, Dkt. No. 142.)

---

[2] The 2014 Form 5500 states that there were two "active participants" at the beginning of the Plan year but no "active participants" at the end of that year. (Pls.' 56.1 Counter-Statement ¶ 57.)

**7. Termination of Business Relationship Between Plaintiffs and Defendant**

By February 2014, the relationship between Hilary and Marianne had deteriorated. (H. Rhoda Decl. ¶¶ 14-15, Dkt. No. 123.) According to Hilary, her business relationship with her mother ruptured in part because Marianne attempted to control the people with whom Hilary associated, professionally and personally. (*Id.*) The relationship also allegedly deteriorated because Marianne refused to provide Hilary with documentation about her personal and business finances. (*Id.*)

Hilary ultimately decided that she no longer wished to continue her business relationship with her mother, preferring that they have solely a mother-daughter relationship. (*Id.*) Hilary ended her business relationship with Marianne in a text message on February 4, 2014 – nearly three years prior to the expiration of the 2010 Manager Agreement. (Def.'s Rule 56.1 Counterstatement ¶ 28.) On or about February 5, 2014, Marianne served Hilary with a formal Notice of Default, as required under that agreement. (*Id.*) In this notice, Marianne stated that Hilary breached the 2010 Manager Agreement when she fired Marianne, making it impossible for Marianne to fulfill her duties as a business manager under that agreement. (Ehrenberg Decl., Ex. 21, Dkt. No. 154.) Marianne additionally stated in the Notice of Default that Hilary breached the contract by making disparaging statements about Marianne to third parties, disclosing the financial terms of the 2010 Manager Agreement, including Marianne's compensation, to a third party, and allowing a third party to interfere with and negotiation contracts without Marianne's written permission. (*Id.*) Finally, Marianne stated in the notice that her termination was an attempt by Hilary to convert commission to which she was entitled. (*Id.*)

As a result of Marianne's refusal to turn over HRH's financial records, Hilary and HRH began to investigate Marianne's conduct. (*Id.* ¶ 16.) After Hilary's repeated demands, Marianne

19

provided Hilary's representatives with approximately 1,000 pages of HRH's books and records. (*Id.*; Def.'s Rule 56.1 Counterstatement ¶ 30.) Hilary's attorney then retained an accounting firm, Adeptus Partners, to conduct a forensic accounting of the available books and records in order to reconstruct, to the extent possible, Hilary's and HRH's financial history. (H. Rhoda Decl. ¶ 17, Dkt. No. 123.)

According to Hilary, she learned through this investigation that Marianne had used corporate funds to pay for various personal expenses, and had transferred corporate funds into a 401(k) account in her name. (*Id.* ¶ 18.) Hilary asserts that, while her representatives had asked Marianne to explain these personal transactions prior to the filing of the instant lawsuit, Marianne refused to offer any explanation. (*Id.* ¶ 19.) Marianne disputes this contention. According to Marianne, she was unable to explain the transactions only because Hilary and HRH cut off her access to HRH's bank accounts and credit card accounts after their professional rupture, and because they deleted all of her HRH emails in March 2014. (Def.'s Rule 56.1 Counterstatement ¶ 31.)

Shortly after Marianne was terminated in February 2014, Hilary established Winnie & Chloe, LLC ("Winnie and Chloe"), a Delaware limited liability corporation with its principal place of business in New York, to act as her new "furnishing company." (H. Rhoda Decl. ¶ 3, Dkt. No. 87.) According to Hilary, she established the company to "disentangle [her] business affairs from HRH – a company that was formed, managed and controlled by her mother . . . and to pursue those affairs going forward through the structure of a limited liability company, instead of a corporation." (*Id.* ¶ 4.)

20

### 8. Defendant's Alleged Breach of Fiduciary Duty

According to Plaintiffs, from early 2007 to February 2014, Marianne regularly made payments and incurred charges, using corporate funds from HRH's checking account and credit cards, with no legitimate business purpose. (Pls.' Rule 56.1 Statement ¶¶ 40-50.) These transactions, Plaintiffs contend, were made for her own benefit and for the benefit of non-employees such as Hilary's brother, Spencer Rhoda, and Marianne's boyfriend. (*Id.*) According to Plaintiffs, from 2007 to February 2014, Marianne improperly diverted over $1.6 million in HRH funds. (Krant Decl. ¶ 45, Dkt. No. 124)

It is undisputed that Marianne paid for personal, non-business expenses using HRH funds. (Pls.' Rule 56.1 Statement ¶ 40; Def.'s Rule 56.1 Counterstatement ¶ 40.) Plaintiffs contend that these expenses included, among other things, retail clothing purchases at luxury department stores, college tuition payments for Spencer, gym membership fees, home furnishings, personal state tax payments, and personal medical expenses. (Pls.' Rule 56.1 Statement ¶¶ 41-49.)

According to Plaintiffs, Marianne did not maintain a general ledger for HRH or any other contemporaneously-prepared accounting record of credits and debits to HRH's bank accounts. (Pls.' Rule 56.1 Statement ¶ 32.) They contend that she did not record deposits, credits or non-check debits into the checkbook for the HRH checking account. (Pls.' Rule 56.1 Statement ¶ 33.) Marianne disputes this. She asserts that she kept handwritten notes of business and personal expenses, and provided these notes to HRH's accountants on a quarterly basis, prior to the preparation of HRH's tax returns. (M. Rhoda Decl. ¶ 18, Dkt. No. 152.) She also asserts that she maintained electronic copies of vendor invoices, bank statements, credit card statements, and other financial documents in her HRH email account. (*Id.* ¶ 19.)

21

Finally, Marianne paid herself the commissions to which she believed she was entitled by writing checks to herself or transferring money directly into her bank account. (Pls.' Rule 56.1 Statement ¶ 39.) Plaintiffs assert that Marianne was entitled to $2,371,101.15 in commissions for the period February 2007 to February 2014, (Krant Decl. ¶ 20, Dkt. No. 124.); Marianne asserts she actually earned $2,606,890 in commissions during the same period. (Barsky Decl., Schedule H, Dkt. No. 153.)

### 9. Defendant's Claim for Benefits and HRH's Benefits Determination

On March 13, 2014, after Marianne was terminated, Barrett received a request from Marianne for a distribution of funds from both the Defined Benefit Plan and the 401(k) Plan. (Harders Decl. ¶ 17, Dkt. No. 143.) At the time of the request, Marianne was still the trustee of the Plans. (*Id.*, Ex. C.) On March 21, 2014, HRH's counsel on ERISA-related matters, Gretchen Harders, asked Barrett to provide copies of all plan documents and documentation relating to Marianne's distribution request. (*Id.* ¶ 18.) Harders also indicated to Barrett that HRH intended to remove Marianne as trustee of the Plans. (*Id.*, Ex. D.)

Between March and June 2014, Harders and several other attorneys with her law firm reviewed Marianne's distribution request. (*Id.* ¶ 18.) As part of the review, they examined plan documents, HRH's annual tax filings, HRH's corporate governance documents, documents submitted by Marianne, and the 2010 Manager Agreement. (*Id.* ¶ 19.)

After the review concluded, HRH informed Marianne, by letter dated June 8, 2014, that her request for distribution of the funds that she rolled over into her 401(k) account from her previous employment was granted, but that the request for distribution of funds beyond the rollover amounts was denied. (*Id.* ¶ 21.) The letter stated that her request was denied because she was not eligible to participate under either the Defined Benefit Plan or the 401(k) Plan. (*Id.*)

22

Principally, the letter stated that Marianne acted only as an independent contractor in her role as business manager and was never an employee of HRH. (*Id.*)

By letter dated August 4, 2014, Marianne appealed the denial. (*Id.* ¶ 22.) Marianne's letter appealing the denial stated that she was an HRH employee; she pointed out that she received W-2 forms from HRH every year since 2007 and that the company paid withholding taxes. (*Id.*, Ex. G.) The letter also attached a list of the duties and services that she had as HRH's corporate officer and employee. (*Id.*) These duties and services included paying quarterly taxes for HRH, creating HRH bank accounts, filing corporate reports, signing HRH documents as a corporate officer, obtaining insurance for the company vehicle, maintaining a house in Southampton, NY that was titled to HRH, reviewing tax issues with accountants, and reviewing an "unexecuted prenuptial contract for purposes of protecting HRH Group assets." (*Id.*)

While Marianne's appeal was still pending, Plaintiffs filed the instant lawsuit on August 20, 2014.

On September 30, 2014, Marianne supplemented her appeal letter with additional supporting documentation to show that she was an employee of HRH, and not an independent contractor. (*Id.* ¶ 23.) The record before the Court contains only a portion of this supporting documentation, and includes:

(1) the IMG contract, effective as of February 9, 2007;

(2) the 2012 W-2 forms for Marianne[3] and Hilary;

(3) Marianne's distribution request to NERT;

(4) Marianne's Defined Benefit Plan account summary for 2013;

---

[3] Marianne indicates that she also submitted her 2008 W-2 for HRH's consideration on appeal. (Def.'s 56.1 Statement ¶ 45.) However, neither party has submitted the document itself to the Court.

     (5) the Defined Benefit Plan annual valuation reports for years 2012 and 2013;

     (6) Marianne's 401(k) Plan account statement for the period January 1, 2014 to March 10, 2014;

     (7) Marianne's Defined Benefit Plan account statement for the periods January 1, 2008 to March 31, 2008 and January 1, 2013 to September 6, 2013;

     (8) the 2012 valuation report for the Defined Benefit Plan;

     (9) Hilary's Defined Benefit Plan account summary for 2012;

     (10) Marianne's Defined Benefit Plan account summary for 2012;

     (11) the 401(k) Plan contribution report and summary of participant accounts for 2012;

     (12) the 2012 Form 5500 for the 401(k) Plan; and

     (13) the 2012 Form 5500 for the Defined Benefit Plan.

(Ehrenberg Decl., Ex. 7, Dkt. No. 118.) The record also contains a list of "Documents Received from Marianne Rhoda's Attorney" during the administrative review, but the referenced documents themselves are not attached. (*Id.*) This list includes items such as: a 2007 statement from IMG Paris, a 2009 Estee Lauder contract extension, a 2010 Vogue contract, a 2009 W-9 tax form, a 2010 "NYS Worker's Compensation Penalty Withdrawal," and a 2012 "Estimated Tax Voucher." (*Id.*)

     Harders testified that in her review of Marianne's claim, she reviewed the plan documents, including those provided by the third-party plan administrator, Thomas Barrett; HRH shareholder resolutions and by-laws; HRH tax returns and W-2 forms; the documentation provided by M. Rhoda through her counsel; public court filings in the instant lawsuit; and the 2010 Manager Agreement. (*Id.* ¶ 30.) She did not consider the 2013 or 2014 Forms 5500 for the Plans. (*Id.* ¶ 32.) As part of their review, they also communicated with Hilary, Barrett, Plaintiffs' other counsel, and the forensic accounts hired to review HRH's business records. (*Id.*)

On December 2, 2014, HRH again denied Marianne's appeal in part and granted it in part. (*Id.* ¶ 26.) Consistent with its initial determination, HRH granted the appeal to the extent that Marianne requested distribution of her rollover funds and authorized their distribution. (*Id.*) However, it again denied Marianne's claim for distribution of funds beyond the rollover funds. (*Id.*) The letter stated that this part of Marianne's claim was denied because she acted only as an independent contractor, not as an HRH employee. (*Id.*) It additionally stated that even if she were an employee, after reviewing the company's corporate records, HRH was unable to determine that Marianne performed the requisite 1,000 hours of service required to participate in either plan. (*Id.* ¶ 28.) Finally, the letter stated that Marianne had exhausted her administrative remedies and had the right to bring a civil action under 29 U.S.C. § 1132(a). (*Id.*)

## PROCEDURAL HISTORY

This lawsuit was filed by Hilary and HRH on August 20, 2014. (Compl., Dkt. No. 1.) The Complaint alleges eight causes of action.

In their first cause of action, Plaintiffs allege that Marianne breached her fiduciary duty to her client-daughter and to HRH by, among other things, diverting HRH funds to her own personal benefit, without any legitimate or legal basis for doing so.

In their second cause of action, Plaintiffs allege that Marianne converted in excess of $1,000,000 in HRH funds to her own personal benefit.

In their third cause of action, Plaintiffs allege that Marianne was unjustly enriched, at the expense of HRH, through her diversion of HRH funds to her personal benefit.

In their fourth cause of action, Plaintiffs ask this Court to order Marianne to provide an accounting to identify all financial activities and transactions of Hilary and HRH, including all

25

commissions, payments, reimbursements, or other funds paid to Marianne or third parties in connection with Hilary's professional activities and the activities of HRH.

In their fifth cause of action, Plaintiffs seek an injunction requiring Marianne to transfer to HRH any company books and records in her possession or control.

In their sixth cause of action, Plaintiffs seek declaratory judgment finding that the 2010 Manager Agreement is void and unenforceable because Marianne induced Hilary to sign the agreement in derogation of her fiduciary duties and failed to disclose the one-sided terms of the agreement.

In their seventh cause of action, Plaintiffs allege, in the alternative to the declaratory judgment sought in their sixth cause of action, that Marianne breached the Manager Agreements by failing to, among other things, provide proper advice to Hilary concerning her career opportunities, negotiate Hilary's contracts, hire and manager other consultants, and act as Hilary's "exclusive personal agent" in connection with Hilary's acting opportunities or her product and trademark licensing opportunities.

In their eighth cause of action, and in the alternative to the declaratory judgment that the Manager Agreement is void and unenforceable (sought in their sixth cause of action), Plaintiffs seek declaratory judgment that the Manager Agreement has been validly terminated.

Marianne filed an Answer and Counterclaims on January 9, 2015. (Answer and Countercls., Dkt. No. 35.)

In her first counterclaim, Marianne alleges that Plaintiffs breached the 2010 Manager Agreement by terminating the contract, without proper notice, over two years prior to its expiration and by failing to pay for services performed by Marianne prior to the contract's termination.

26

In her second counterclaim, Marianne alleges that Plaintiffs were unjustly enriched by the services that Marianne provided as Hilary's business and individual manager under the Manager Agreements and for which Marianne has not received compensation.

In her third counterclaim, Marianne alleges a claim of conversion, contending that Plaintiffs withheld money that she rightfully earned.

In her fourth counterclaim, Marianne seeks imposition of a constructive trust for the money that is owed to her for services performed prior to Plaintiff's breach of the 2010 Manager Agreement.

Marianne also filed supplemental counterclaims, asserting eight ERISA-related counterclaims. (Dkt. No. 35-4.)

First, she alleges that Plaintiffs denied her benefits under an employee benefit plan and an employee pension plan governed by ERISA, in violation of 29 U.S.C. § 1132 (Count I).

Second, she alleges that Plaintiffs took control of plan assets with an intent to convert and use those assets in violation of the fiduciary duties they owed to plan participants and beneficiaries under 29 U.S.C. § 1132 (Count II).

Third, she alleges that Plaintiffs interfered with her exercise of rights under the ERISA plans by retroactively re-classifying her employment status in order to make her ineligible to contribute to and receive benefits from the Plans, in violation of 29 U.S.C. § 1140 (Count III).

Fourth, she alleges that Plaintiffs violated their fiduciary duties, in violation of 29 U.S.C. § 1104, by retaining plan funds due to her with the intent to use the funds for their own purposes (Count IV).

27

Fifth, she alleges that Plaintiffs violated their fiduciary duties, in violation of 29 U.S.C. § 1104(a)(1) by operating with a conflict of interest and commencing the instant litigation in order to obtain control over the benefits to which she is entitled under the Plans (Count V).

Sixth, she alleges that Hilary should be held personally liable for the losses that result from the denial of Marianne's benefits (Count VI).

Seventh, she alleges that Plaintiffs should be estopped from denying the validity of the Plans because they have ratified the existence of the Plans by contributing to them (Count VII).

Eight, she alleges that HRH, in its June 8, 2014 and December 2, 2014 benefits determinations, erroneously calculated the amount of benefits to which she was entitled when it approved her claims in part and denied them in part (Count VIII).

On February 24, 2015, Marianne's attorney, Dino Lombardi, moved to withdraw as counsel. The Court granted leave to withdraw, and the case was stayed. (Dkt. No. 52). On March 26, 2015, Marianne's new attorney, Patrick Monaghan, Jr. entered an appearance. (Dkt. No. 55.) Shortly after Marianne retained new counsel, discovery resumed and various witnesses, including Hilary and Marianne, were deposed.

On September 14, 2015, Marianne filed the instant motion to add Winnie & Chloe as a Counterclaim Defendant and to amend her counterclaims. (Dkt. No. 76.) Marianne seeks to add a claim against Hilary and HRH based on conversion of Marianne's benefits allegedly due to her under the Defined Benefit Plan and the 401(k) Plan.

Plaintiffs then moved for partial summary judgment on their first cause of action – their claim for breach of fiduciary duty. Marianne moved for partial judgement on the pleadings on this same claim, contending that Plaintiffs' claim for breach of fiduciary duty is duplicative of their claim for breach of contract.

28

Marianne has also cross-moved for partial summary judgment on her first ERISA-related counterclaim, alleging that Plaintiffs denied her benefits under 29 U.S.C. § 1132(a)(1)(B).

Due to a clerical error in the Clerk's office, the four instant motions did not appear on the Court's list of open motions or its "overdue" list. The Court found the motions earlier this year.

## APPLICABLE LAW

### A. Legal Standard for Leave to Amend Pleadings and to Join Additional Parties

According to Rule 15 of the Federal Rules of Civil Procedure, "[a] party may amend the party's pleading once as a matter of course at any time before a responsive pleading is served . . . . Otherwise a party may amend the party's pleading only with leave of court . . . and leave shall be freely given when justice so requires." Fed. R. Civ. P. 15(a). "The rule in this Circuit has been to allow a party to amend its pleadings in the absence of a showing by the nonmovant of prejudice or bad faith." *Block v. First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir. 1993).

Leave to amend the pleadings after the expiration of a deadline set by the Court's scheduling order is governed by Fed. R. Civ.P. 16(b)'s more demanding "good cause" standard. *See Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 340 (2d Cir. 2000). "A finding of good cause depends on the diligence of the moving party." *Rent-A-Ctr., Inc. v. 47 Mamaroneck Ave. Corp.*, 215 F.R.D. 100, 104 (S.D.N.Y. 2003). "In other words, the movant must show that the deadlines cannot be reasonably met despite its diligence." *Id.* Additionally, "when the nonmoving party has failed to demonstrate how it will be prejudiced, the court may permit the amendment." *Spanierman Gallery v. Merritt*, No. 00 Civ. 5712, 2004 WL 1488118, at *1 (S.D.N.Y. June 30, 2004). "Courts determine whether prejudice would result from a proposed amendment by 'consider[ing] whether the amendment would require significant additional

29

resources to conduct discovery and prepare for trial or significantly delay resolution of the

dispute.'" *Id.* (quoting *In re Worldcom, Inc. Secs. Litig.*, No. 02 Civ. 3288, 2003 WL 22831008,

at *2 (S.D.N.Y. Dec. 1, 2003)).

Rule 21 allows for addition of parties "at any stage of the action and on such terms as are

just." Fed. R. Civ. P. 21. In deciding whether to allow joinder, courts adhere to "the same

standard of liberality afforded to motions to amend under Rule 15." *Momentum Luggage &*

*Leisure Bags v. Jansport, Inc.*, No. 00 Civ. 7909, 2001 WL 58000, at *2 (S.D.N.Y. Jan. 23,

2001) (quoting *Soler v. G & U, Inc.*, 86 F.R.D. 524, 527-28 (S.D.N.Y. 1980)).

Under Rule, 21 "courts must consider judicial economy and their ability to manage each

particular case, as well as how the amendment would affect the use of judicial resources, the

impact the amendment would have on the judicial system, and the impact [it] would have on

each of the parties already named in the action." *Sly Magazine, LLC v. Weider Publications*

*L.L.C.*, 241 F.R.D. 527, 532 (S.D.N.Y. 2007) (quoting *Momentum Luggage*, 2001 WL 58000, at

*2.) While leave should be freely given, "a court's refusal to grant leave to amend is justified on

grounds of, inter alia, undue delay and undue prejudice." *Id.*

## B. Legal Standard for Judgment on the Pleadings

At any time after the pleadings are closed, but before trial commences, a party may move

for judgment on the pleadings under Rule 12(c). "A grant of a motion pursuant to Rule 12(c) is

proper 'if, from the pleadings, the moving party is entitled to judgment as a matter of law.'"

*Wells Fargo Bank, Nat. Ass'n v. Davidson Kempner Capital Mgmt. LLC*, 32 F. Supp. 3d 436,

440-41 (S.D.N.Y. 2014), *aff'd sub nom. Wells Fargo Bank, Nat. Ass'n v. Bedford CMBS*

*Acquisitions LLC*, 626 F. App'x 341 (2d Cir. 2015) (quoting *Dargahi v. Honda Lease Trust*, 370

F. App'x. 172, 174 (2d Cir. 2010)).

"[T]he legal standards of review for motions to dismiss and motions for judgment on the pleadings 'are indistinguishable.'" *Id.* (quoting *LaFaro v. New York Cardiothoracic Group, PLLC*, 570 F.3d 471, 475 (2d Cir. 2009)). On a motion for judgment on the pleadings, courts "must accept all allegations in the complaint as true and draw all inferences in the non-moving party's favor." *Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 300 (2d Cir. 2003) (quoting *Patel v. Contemporary Classics of Beverly Hills*, 259 F.3d 123, 126 (2d Cir. 2001)). The court "may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010).

## C. Legal Standard for Summary Judgment

A party is entitled to summary judgment when there is no "genuine issue of material fact" and the undisputed facts warrant judgment for the moving party as a matter of law. Fed. R. Civ. P. 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). On a motion for summary judgment, the Court must view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Whether any disputed issue of fact exists is for the Court to determine. *Balderman v. U.S. Veterans Admin.*, 870 F.2d 57, 60 (2d Cir. 1989).

The moving party has the initial burden of demonstrating the absence of a disputed issue of material fact. *Celotex v. Catrett*, 477 U.S. 317, 323 (1986). Once the motion for summary judgment is properly made, the burden shifts to the non-moving party, which "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250. The nonmovant "may not rely on conclusory allegations or unsubstantiated speculation," *Scotto v.*

31

*Almenas*, 143 F.3d 105, 114 (2d Cir. 1998), but must support the existence of an alleged dispute with specific citation to the record materials. Fed. R. Civ. P. 56(c).

While the Court must view the record "in the light most favorable to the nonmoving party," *Leberman v. John Blair & Co.*, 880 F.2d 1555, 1559 (2d Cir. 1989) (citations omitted), and "resolve all ambiguities and draw all reasonable inferences in favor of the party against whom summary judgment is sought," *Heyman v. Commerce and Indus. Ins. Co.*, 524 F.2d 1317, 1320 (2d Cir. 1975) (citations omitted), the non-moving party nevertheless "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec.*, 475 U.S. at 586 (citations omitted). Not every disputed factual issue is material in light of the substantive law that governs the case. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248.

## DISCUSSION

Marianne's motion to add a Counterclaim Defendant and to amend her pleadings is granted. However, Plaintiffs' motion for partial summary judgment and Marianne's cross-motions for judgment on the pleadings and partial summary judgment are denied. Numerous genuine issues of material fact preclude summary judgment at this stage in either party's favor. However, the briefing on these motions reveals to the Court that there are issues that can and should be disposed of now – issues which, for the most part, the parties entirely ignore in their briefs.

At the outset, I remind the parties and the reader that the summary judgment motions currently before the Court are addressed *only* to the claim that Marianne breached her fiduciary

duty to Plaintiffs (Compl., Count I) and the counterclaim that Plaintiffs denied Marianne benefits under HRH's ERISA plans (Supplemental Countercls., Count I).

## I. Defendant's Motion to Add Counterclaim Defendant and to Amend the Pleadings

### A. Request to Amend Counterclaims

At an initial conference, the Court approved a Case Management Plan that stated that no additional parties may be joined after December 19, 2014, and that no pleading may be amended after January 30, 2015. (Dkt. No. 22.) Shortly after the conference, the parties commenced discovery. Plaintiffs' initial production, made on November 14, 2014, contained various communications, agreements, corporate records, and related documents concerning a corporation, Winnie and Chloe. (Giger Decl. ¶¶ 5-6, Ex. A, Dkt. No. 88.) Those documents state that new modeling contracts for Hilary's services should be executed with Winnie and Chloe, and that payments received on such contracts should be deposited into Winnie and Chloe bank accounts, while other funds should be deposited into HRH accounts. (*Id.* ¶ 6, Ex. A.)

On January 23, 2015, the Court granted a 30-day extension of the deadlines sent in the Case Management Plan, which resulted in an extension of the deadline to add additional parties to January 19, 2015 and an extension of the deadline to amend the pleadings to March 1, 2015. (Dkt. No. 40.)

Marianne's application to join Winnie and Chloe and to amend her counterclaims is untimely, because it was filed on September 14, 2015. However, good cause justifies Marianne's delay, and Plaintiffs will suffer no material prejudice if the Court grants the present application.

Marianne's delay in filing the instant motion resulted from the fact that she retained new counsel in March 2015. According to Marianne, her new attorney had to review approximately 40,000 pages of documents produced in discovery and had to handle nine depositions between

33

May to July 2015. (Def.'s Mem. of Law at 10-11, Dkt. No. 82.) The Court does not find that the delay in filing the instant motion resulted from a lack of diligence; it resulted from a change in Marianne's legal representation.

Additionally, the Court does not see a need for any additional discovery as a result of Marianne's proposed amendment to her counterclaims – the addition of a counterclaim against Hilary and HRH based on conversion of benefits allegedly due to Marianne under HRH's ERISA plans. The parties have already conducted extensive discovery related to Marianne's ERISA-related counterclaims. Allowing Marianne amend her counterclaims to add a counterclaim of conversion will not materially impact Plaintiffs' preparation or delay resolution of this dispute.

### B. Application to Add Counterclaim Defendant

The Court required the parties to join any additional parties by January 19, 2015. Marianne filed her motion to add Counterclaim Defendant Winnie and Chloe after this deadline. However, Rule 21 allows for addition of parties "at any stage of the action and on such terms as are just." Fed. R. Civ. P. 21. Because leave should be freely given and because the Court finds that addition of the counterclaim defendant will not cause "undue delay and undue prejudice," *Sly Magazine, LLC*, 241 F.R.D. at 532, the motion to add Winnie and Chloe as a Counterclaim Defendant is granted.

Plaintiffs have known about the existence of Winnie and Chloe all along, and a fair amount of discovery relating to Winnie and Chloe has already been produced. While Hilary has already been deposed, she was asked about Winnie and Chloe's corporate structure and its business operations at her deposition. (Monaghan Decl. ¶ 13, Ex. 6 at 152-53, Dkt. No. 81.) Accordingly, the Court foresees no undue delay or undue prejudice that would result from the addition of Winnie and Chloe as a Counterclaim Defendant.

34

The addition of Winnie and Chloe as a Counterclaim Defendant is also permitted, because Marianne adequately states a claim of successor liability against the company.

In evaluating Marianne's claim of successor liability, the Court must first determine which state's law governs the analysis. Where jurisdiction is based on the diversity of the parties, the Court must look to the choice-of-law rules of the forum state to determine which state's law applies. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). Under New York's choice-of-law rules, a court first determines whether there is an actual conflict between the laws of the relevant jurisdictions. *See Beth Israel Med., Ctr. v. Horizon Blue Cross & Blue Shield of NJ, Inc.*, 448 F.3d 573, 582-83 (2d Cir. 2006). When an actual conflict exists, the law of the jurisdiction having the greatest interest in the litigation will be applied. *See Kalb, Voorhis & Co. v. Am. Fin. Corp.*, 8 F.3d 130, 132 (2d Cir. 1993). When there is *no* actual conflict with the law of the forum state and the law of the state with the greatest interest on the particular issue, New York law will be applied. *See Wall v. CSX Transp., Inc.*, 471 F.3d 410, 422 (2d Cir. 2006)

"New York courts determining successor liability have concluded that the state with the most interest is the defendant corporation's place of incorporation." *Tommy Lee Handbags Mfg. Ltd. v. 1948 Corp.*, 971 F. Supp. 2d 368, 378 (S.D.N.Y. 2013). Winnie and Chloe is a Delaware corporation, so the Court turns to Delaware law in determining whether successor liability is properly pleaded.[4] If there is no conflict between New York and Delaware law, I will apply New York law.

---

[4] Marianne indicates in her brief that Maryland law should apply since the contract at issue (the 2010 Manager Agreement) contains a Maryland choice-of-law provision. She is incorrect. In any event, in evaluating successor liability claims, there is no actual conflict between Maryland and Delaware law or between Maryland and New York law.

Both Delaware and New York law recognize four exceptions to the general rule barring successor liability: (1) where the buyer expressly assumed the debt at issue; (2) where the transaction was undertaken to defraud creditors; (3) where the transaction constitutes a de facto merger; or (4) where the successor is a mere continuation of the predecessor. *Tommy Lee Handbags Mfg. Ltd.*, 971 F. Supp. 2d at 378; *Schumacher v. Richards Shear Co., Inc.*, 59 N.Y.2d 239, 245 (1983); *Ross v. Desa Holdings Corp.*, No. 05C–05–013, 2008 WL 4899226, at *4 (Del. Super. Ct. Sept. 30, 2008).

Marianne alleges that Winnie and Chloe is a "mere continuation" of its predecessor, HRH. Under New York law, "[a] continuation envisions a common identity of directors [an] stockholders and the existence of only one corporation at the completion of the transfer." *Societe Anonyme Dauphitex v. Schoenfelder Corp.*, No. 07 Civ. 489, 2007 WL 3253592, at *6 (S.D.N.Y. Nov. 2, 2007) (internal quotation marks omitted). Similarly, under Delaware law, continuation principally includes the common identity of the officers, directors, or stockholders of the predecessor and successor corporations, and the existence of only one corporation at the completion of the transfer. *Magnolia's at Bethany, LLC v. Artesian Consulting Engineers, Inc.*, No. Civ. A. S11C-04013ESB, 2011 WL 4826106, at *3 (Del. Super. Ct. Sept. 19, 2011). "Notably, both states also require narrow construal of the mere continuation exception such that it is only available where 'it is not simply the business of the original corporation which continues, but the corporate entity itself.'" *Tommy Lee Handbags Mfg. Ltd.*, 971 F. Supp. 2d at 380. There is no actual conflict between Delaware and New York law on the mere continuation exception to successor liability, so the Court will apply New York law.

Plaintiffs argue that Winnie and Chloe should not be subject to successor liability, since HRH is not undercapitalized or unable to satisfy any judgment. (*See* H. Rhoda Decl. ¶ 7, Dkt.

36

No. 87.) However, a claim of successor liability can be sufficiently pled under a theory of "mere

continuation" even if the predecessor corporation is not extinguished and even if the predecessor

retains assets. *See Societe Anonyme Dauphitex*, 2007 WL 3253592, at \*5-\*6. Even if HRH still

exists and holds assets, Winnie and Chloe nonetheless appears to be a mere continuance of HRH,

because there is continuity in ownership. Hilary was the owner and sole shareholder of HRH; she

is now the owner and sole shareholder of Winnie and Chloe (Monaghan Decl. ¶ 13, Ex. 10, Dkt.

No. 81.) She was the President and Director of HRH; she is now the Managing Member of

Winnie and Chloe. (*Id.* ¶ 13, Ex. 9.) Successor liability can also be adequately pled where the

predecessor corporation is now defunct and where its successor is in the same line of business

operating from the same location. *Tommy Lee Handbags Mfg. Ltd.*, 971 F. Supp. 2d at 380.

While HRH has not been formally dissolved, it is inactive and its corporate charter has lapsed.

(Monaghan Decl. ¶ 13, Ex. 7, Dkt. No. 81.) Winnie and Chloe operates the same business that

HRH operated – serving as Hilary's "furnishing company." Winnie and Chloe contracts with

companies on Hilary's behalf and receives the proceeds from her modeling contracts. (*Id.* ¶ 13.)

These allegations are sufficient to assert a theory of mere continuation.

    Marianne's motion for leave to file an amended counterclaim and to add Winnie and

Chloe as a Counterclaim Defendant is granted.

## II.    Plaintiffs' Motion for Partial Summary Judgment and Defendant's Motion for Partial Judgment on the Pleadings

    Plaintiffs moves for partial summary judgment on their claim that Marianne breached her

fiduciary duties, and Marianne moves for partial judgment on the pleadings with respect to this

same claim.

    There are several preliminary matters to consider that relate to both motions.

### A. Plaintiffs' Breach of Fiduciary Duty Claim Is Not Duplicative of Their Breach of Contract Claim

In her motion for partial judgment on the pleadings as to Plaintiffs' claim for breach of

fiduciary duty, Marianne argues that the claim is duplicative of Plaintiffs' breach of contract

claim. She contends that because her fiduciary responsibilities arose from the 2010 Business

Manager Agreements, Plaintiffs' allegations are really about breach of that contract.[5] Here,

Marianne is wrong.

As will be discussed further below, Marianne owed Plaintiffs fiduciary duties in two

capacities. She owed them fiduciary duties in her role as Hilary's business manager and in her

role as HRH's corporate officer.

Even if Marianne's duties arose only from her role as business manager, Plaintiffs' claim

for breach of fiduciary duty would not be duplicative to the claim for breach of the Manager

Agreement. Under New York law, "conduct constituting a breach of contract may also give rise

to an actionable fiduciary duty claim, if 'a legal duty independent of the contract itself has been

violated.'" *Le Metier Beauty Inv. Partners LLC v. Metier Tribeca, LLC*, No. 13 Civ. 4650, 2015

WL 769573, at *7 (S.D.N.Y. Feb. 24, 2015) (quoting *GPIF-I Equity Co. v. HDG Mansur Inv.

Servs., Inc.*, No. 13 Civ. 547, 2014 WL 1612004, at *4 (S.D.N.Y. Apr. 21, 2014)). "Such a duty

may be independent of contract and yet emerge from a relationship of trust and confidence

created by a contract." *GPIF-I Equity Co.*, 2014 WL 1612004, at *12. In other words, "the same

conduct which may constitute the breach of a contractual obligation may also constitute the

---

[5] Although Plaintiffs include a claim in their complaint seeking declaratory judgment that the 2010 Manager Agreement is void and unenforceable, they assume, for the purposes of their motion for partial summary judgment, that the contract is enforceable. At the same time, they reserve the right to argue at trial that the 2010 Manager Agreement is void and unenforceable as a result of Marianne's breaches of fiduciary duty. (*See* Pl's Mem. of Law at 4.)

38

breach of a duty arising out of the relationship created by contract but which is independent of the contract itself." *Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC.*, 376 F. Supp. 2d 385, 408 (S.D.N.Y. 2005).

Here, the fiduciary duties that Plaintiffs claim were breached by Marianne are independent of the agreement at issue in this case. First, Marianne had a fiduciary duty, as Plaintiffs' business manager exercising control over their finances, not to misappropriate HRH funds and engage in self-dealing transactions. These are common-law duties; they do not arise from the terms of the 2010 Manager Agreement governing Marianne's professional role. Indeed, the agreement does not contain any provision that prohibits Marianne from misappropriating funds or from self-dealing. This is not surprising. Because Marianne had common-law obligations to refrain from engaging in such misconduct, these prohibitions need not be written into contract.

Second, Marianne conducted herself as HRH's corporate officer and therefore owed Plaintiffs fiduciary duties in that capacity as well. To the extent that Marianne's fiduciary duties derived from her role as a corporate officer, they did not depend on the 2010 Manager Agreement at all.

Plaintiffs' breach of fiduciary duty claim is not duplicative of their breach of contract claim. Defendant's motion for partial judgment on the pleadings is, therefore, denied.

### B. Statute of Limitations

A preliminary issue that must be addressed is the issue of the applicable statute of limitations – an issue ignored by both parties in their briefs.

This lawsuit was brought on August 20, 2014. The parties did not brief the statute of limitations issues, and their experts have delivered reports "proving" damages for breach of

fiduciary duty and failure to pay commissions that go back to 2007.[6] It does not appear that the parties have given any thought to whether some portion of these claims might be time-barred. The Court, however, has.

Insofar as Plaintiffs' breach of fiduciary duty claim is concerned: Marianne owed two types of fiduciary duties to her daughter and to her daughter's corporation – one arising from her role as an officer/director of HRH, and one arising from her role as Hilary's business manager.

First, Marianne owed Plaintiffs fiduciary duties in light of her role as their business manager, exercising extensive (if not exclusive) control over their finances. Marianne's breach of these duties is governed by New York law. Although both the 2005 and 2010 Manager Agreements contain Maryland choice-of-law provisions, these provisions are irrelevant to the instant analysis because breach of fiduciary duty is a tort. "[U]nder New York law, a contractual choice of law provision governs only a cause of action sounding in contract, not one sounding in tort." *Tucker v. Janney Montgomery Scott, Inc.*, No. 96 Civ. 1823, 1997 WL 151509, at *4 (S.D.N.Y. Apr. 1, 1997) (quoting *Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1540 (2d Cir. 1997)).

Because the contractual choice-of-law provision does not govern this claim, the Court looks to New York's interest analysis, under which, for issues relating to tort claims, the significant contacts are, almost exclusively, the parties' domiciles and the locus of the tort. *Id.* Although Marianne is domiciled in Maryland, Hilary is domiciled in New York and HRH's principal place of business is in New York. The locus of the tort – Marianne's breach of fiduciary duty – is also in New York. New York law, therefore, governs this claim.

---

[6] Marianne asserted a general statute of limitations defense in her Answer to Plaintiffs' Complaint but did not discuss it in briefing the instant motions.

40

In New York, business managers who control finances are held to strict fiduciary duties with respect to the accounts and financial affairs of their clients. *See Malmsteen v. Berdon, LLP*, 369 F. App'x 248, 251 (2d Cir. 2010); *Goldstein v. Cogswell*, 1989 U.S. Dist. LEXIS 13652 (S.D.N.Y. Nov. 15, 1989). Under New York law, a breach of fiduciary duty claim seeking relief that is equitable in nature (i.e., an injunction or an accounting) is subject to a six-year limitations period under CPLR § 213(1), but a claim seeking money damages is subject to a three-year limitations period under CPLR § 214(4). *IDT Corp. v. Morgan Stanley Dean Witter & Co.*, 12 N.Y.3d 132, 139 (2009). Here, Plaintiffs seek only damages, so their claim is subject to a three-year limitations period.

Second, Marianne owes Plaintiffs fiduciary duties in light of her role as HRH's corporate officer. "Under New York's choice of law principles, a claim involving breach of a fiduciary duty owed by a corporate officer is governed by the law of his company's state of incorporation." *Id.* HRH is a Virginia corporation, so Virginia law applies to Plaintiffs' claim insofar as Marianne allegedly breached her duties as a corporate fiduciary.

In Virginia, a breach of fiduciary duty claim that accrues on or after July 1, 1995 is subject to a two-year statute of limitations. Va. Code Ann. § 8.01-248; *see also Broyhill v. Bank of Am., N.A.*, No. 10 Civ. 905, 2010 WL 3937400, at *3 (E.D. Va. Oct. 6, 2010).

Because Marianne's duties as HRH's corporate officer and her duties as Hilary's business manager overlap – that is, the same conduct is alleged to have violated both of Marianne's fiduciary duties – the longer statute of limitations governs. Thus, New York's three-year limitations period sets the limit on what Plaintiffs can recover. Accordingly, they can only obtain damages from August 20, 2011 to August 20, 2014.

41

This ruling renders much of the evidence and argument that has been submitted to the Court irrelevant. This includes the conclusions of the experts, both of whom go back too far in time.

Of course, Plaintiffs' other claims have their own limitations periods. Their unjust enrichment claim, for example, is subject to a six-year limitations period. CPLR § 213(1); *see also Williams-Guillaume v. Bank of Am., N.A.*, 14 N.Y.S.3d 466, 469 (2d Dep't 2015). On this claim, Plaintiffs can collect damages for that claim going back to August 20, 2008 – but no earlier.

Marianne's counterclaims also have their own statutes of limitations. For example, Marianne has filed a breach of contract counterclaim, seeking payment for unpaid commissions. Because the 2010 Manager Agreement contains a Maryland choice-of-law provision, Maryland law applies to Marianne's breach of contract counterclaim. In Maryland, breach of contract claims are governed by a three-year statute of limitations. *Boyd v. Bowen*, 649, 806 A.2d 314, 321 (Md. 2002). This would bar Marianne from collecting any allegedly unpaid commissions that were owed to her prior to August 20, 2011, or any other unpaid expenses to which she was contractually entitled that accrued prior to August 20, 2011.[7]

But the instant motion is limited to Plaintiffs' claim for breach of fiduciary duty, because it is the only claim for which Plaintiffs have moved for partial summary judgment. Therefore, that is the only statute of limitations pertinent to the cross-motions that are presently before the Court.

---

[7] New York's statute of limitations on the contract claim would have been six years, CPLR § 213(2), but under New York's choice-of-law rules, the contract's express choice-of-law controls.

42

Since the parties overlooked the applicable statute of limitations in briefing the instant

motions, Plaintiffs have not taken a position on whether the statute of limitations for their breach

of fiduciary duty claim should be tolled. However, the doctrine of equitable tolling permits a

court, "under compelling circumstances, [to] make narrow exceptions to the statute of limitations

in order 'to prevent inequity.'" *In re U.S. Lines, Inc.*, 318 F.3d 432, 436 (2d Cir. 2003) (quoting

*Chao v. Russell P. Le Frois Builder, Inc.*, 291 F.3d 219, 223 (2d Cir. 2002)). The statute of

limitations may be equitably tolled, for example, when a defendant fraudulently conceals from a

plaintiff the fact that the plaintiff has a cause of action, or when the plaintiff is induced by the

defendant to forego a lawsuit until the statute of limitations has expired. *See Pearl v. City of

Long Beach*, 296 F.3d 75, 82-83 (2002).

In New York, a claim for the tort of breach of fiduciary duty accrues when "all elements

of the tort can be truthfully alleged in a complaint." *IDT Corp. v. Morgan Stanley Dean Witter &

Co.*, 12 N.Y.3d 132, 140. But "[o]n occasion, when legal principles governing accrual have

appeared to cause anomalous or unfair results, courts have applied equitable principles to prevent

a party that steals or breaches trust . . . from benefitting from its wrong." *State v. Seventh

Regiment Fund, Inc.*, 98 N.Y.2d 249, 261 (2002). Equitable estoppel will toll the statute of

limitations "where plaintiff was induced by fraud, misrepresentations or deception to refrain

from filing a timely action." *Zumpano v. Quinn*, 6 N.Y.3d 666, 674 (2006) (quoting *Simcuski v.

Saeli*, 406 N.Y.S.2d 259 (1978)). "Moreover, the plaintiff must demonstrate reasonable reliance

on the defendant's misrepresentations." *Id.*

Under Virginia law, a "plaintiff's claim for breach of fiduciary duty accrue[s] at the time

of the breach, not at the time [the] plaintiff discover[s] the breach." *Jones v. Shooshan*, 855 F.

Supp. 2d 594, 603 (E.D. Va. 2012). However, the statute of limitations is tolled until "a person

43

intentionally misled by a putative defendant could reasonably discover the wrongdoing and bring action to redress it." *F.D.I.C. v. Cocke*, 7 F.3d 396, 402 (4th Cir. 1993).

Hilary states in an affidavit that she did not discover much of Marianne's misbehavior until after she fired her mother in 2014. However, Plaintiffs have not expressly contended that their belated discovery was caused by fraud, misrepresentation, or deception on Marianne's part. The statement of facts above certainly suggests that Hilary was aware of Marianne's use of HRH funds for non-business expenses (if not the precise amount of her use of funds) much earlier than 2014, at which point she fired her mother. There is also no evidence that Hilary, who was in her twenties, was incapable of policing her mother's conduct. Since Plaintiffs have not argued equitable tolling, the Court will assume without deciding, for the purposes of this motion, that the statute of limitations has not been equitably tolled.

### C. Hilary's Standing to Maintain a Breach of Fiduciary Duty Claim

Another preliminary matter is the question of Hilary's standing to bring a claim in her own right. Marianne asserts that Hilary lacks standing to maintain her claim for breach of fiduciary duty, because the claim belongs to HRH. She is wrong. In any event, Hilary's standing is of no real moment, because HRH has brought the breach of fiduciary duty claim against Marianne, and HRH certainly has standing to sue its corporate officer.

The standing requirement assures that an Article III "case or controversy" exists by allowing only those with actual legal injury to bring suit in federal court; moreover, judge-made "prudential" limitations on standing foster appropriate judicial restraint. "Foremost among the prudential requirements is the rule that a party must 'assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.'" *Wight v. BankAmerica Corp.*, 219 F.3d 79, 86 (2d Cir. 2000) (quoting *Warth v. Seldin*, 422 U.S. 490, 499

44

(1975)). To satisfy the constitutional standing requirement, a plaintiff must demonstrate "(1) a personal injury in fact (2) that the challenged conduct of the defendant caused and (3) which a favorable decision will likely redress." *Mahon v. Ticor Title Ins. Co.*, 683 F.3d 59, 62 (2d Cir. 2012).

As discussed above, Marianne owes fiduciary duties to Plaintiffs in two capacities – as HRH's corporate officer and as Hilary's business manager. As such, Hilary has individual standing, apart from her status as a shareholder of HRH, to sue Marianne, because Marianne owed fiduciary duties to Hilary personally as her business manager. These fiduciary duties arise out of the relationship between Hilary and Marianne created by the 2005 and 2010 Manager Agreements. As Hilary's business manager, Marianne held a position of trust and confidence over Hilary's finances. Indeed, the 2010 Manager Agreement specifically gives Marianne the authority to "maintain and control accounts for the deposit of all income received by HRH Inc., *and/or Hilary Rhoda* . . . ; and distribute all salary/compensation to individuals listed . . . above, as well as Marianne K. Rhoda and *Hilary Rhoda*." (Giger Decl., Ex. F, Dkt. No. 125 (emphasis added).) Marianne's alleged misappropriation and mishandling of funds that belonged to Hilary would have caused a direct injury to Hilary.

Accordingly, Hilary has standing to bring her breach of fiduciary duty claim against Marianne.

### D. Exculpation

The final preliminary issue that must be addressed is whether Marianne's liability for breach of fiduciary duty is eliminated by an exculpatory provision in HRH's corporate governing documents.

The Virginia Stock Corporation Act permits the elimination of liability of directors and

officers if such a limitation is set forth in a corporation's articles of incorporation:

A. In any proceeding brought by or in the right of a corporation or brought by or on behalf of shareholders of the corporation, the damages assessed against an officer or director arising out of a single transaction, occurrence or course of conduct shall not exceed the lesser of:

1. The monetary amount, *including the elimination of liability, specified in the articles of incorporation* or, if approved by the shareholders, in the bylaws as a limitation on or elimination of the liability of the officer or director . . . .

B. *The liability of an officer or director shall not be limited as provided in this section if the officer or director engaged in willful misconduct* or a knowing violation of the criminal law or of any federal or state securities law . . . .

Va. Code Ann. § 13.1-692.1 (emphasis added).

HRH's articles of incorporation include a provision limiting liability for its officers and

directors in actions brought by or on behalf of HRH or its shareholders. That exculpatory

provision states:

In any proceeding brought by or in the right of the corporation or brought by or on behalf of shareholders of the corporation, no director or officer of the corporation shall be liable to the corporation, or its shareholders for monetary damages with respect to any transaction, occurrence, or course of conduct, whether prior or subsequent to the effective date of this Article, except for liability resulting from such person's having engaged in *willful misconduct*, or a knowing violation of the criminal law or any federal or state securities law.

(Ehrenberg Decl., Ex. 12, Art. VI, § 7.2, Dkt. No. 154 (emphasis added).)

Plaintiffs argue that HRH's exculpatory provision does not apply to their breach of

fiduciary duty claim because the misconduct they allege was willful. Plaintiffs are correct.

In *In re LandAmerica Fin. Grp., Inc.*, 470 B.R. 759, 786 (Bankr. E.D. Va. 2012), the

court interpreted "willful misconduct" under the Virginia exculpation statute to mean an

"intentional act or omission that is wrongful, regardless whether injury was intended." In that

46

case, the court concluded that the transfer of funds by several defendants without requisite review and approval by the Board of Directors and in violation of corporate guidelines rose to the level of willful misconduct. *Id.*

In this case, as in *In re LandAmerica*, Plaintiffs' claim that Marianne misappropriated over $1.6 million in HRH funds is a claim that she engaged in willful misconduct. Plaintiffs contend that Marianne incurred a number of illegitimate expenses using corporate funds, and did so intentionally to benefit herself, as well as her friends and her family. Because HRH's exculpatory provision states that corporate directors or officers are *not* exempt from liability when they engage in "willful misconduct," Marianne is not exempt from liability for breach of fiduciary duty.

## E. Plaintiffs' Claim for Breach of Fiduciary Duty

Having addressed the preliminary matters, the Court now turns to the merits of Plaintiffs' motion for partial summary judgment.

Plaintiffs assert that Marianne breached her fiduciary duties by misappropriating and mishandling HRH's corporate funds in a number of ways: (1) overpaying herself commissions; (2) charging, and allowing third-parties to charge, non-business expenses to HRH credit cards; (3) incurring non-business expenses on HRH's check and debit card accounts; (4) taking out unauthorized loans from HRH; and (5) transferring HRH funds to a 401(k) account in her name.

As discussed above, Plaintiffs can only recover for misappropriations that occurred three years or less from date that the lawsuit was filed – on and after August 20, 2011. However, the briefing by both parties addresses Plaintiffs' claim for recovery over a period that plainly exceeds the limitations period – from January 2007 to February 2014. The experts on both sides have also submitted reports for the instant motion analyzing Marianne's transaction history

47

dating back to 2007. Thus, for purposes of the discussion below, the Court has re-calculated, based on the expert reports (where it was possible to do so), the relevant amounts subject to Plaintiffs' claim given a three-year statute of limitations.

### 1. Marianne's Overpayment of Commissions

Plaintiffs allege that Marianne overpaid herself commissions through the period when the parties terminated their relationship in February 2014. Marianne retorts that she not only did not overpay her allowable commissions, but that she actually underpaid herself and is entitled to additional money.

The evidence is insufficient to resolve the question of whether Marianne overpaid herself commissions within the limitations period.

First, the evidence, which consists primarily of the two expert reports, goes back too far in time and includes transactions that occurred as early as 2007. Prior to trial, both parties will have to submit updated expert reports to reflect the applicable limitations period of three years.[8]

Second, the Court cannot direct summary judgment because genuine issues of material fact exist as to how much Marianne was owed in commissions.

The parties disagree as to how Marianne's commission should be calculated under the 2010 Manager Agreement. They both agree that she is entitled to a commission of 15 percent, but they disagree as to the base number on which to apply this 15 percent.

_____

[8] Plaintiffs contend that Defendant's supplemental expert report should not be considered in deciding the instant motion because it was submitted late, after the close of discovery. Plaintiffs submitted an expert report on March 31, 2016. Marianne's expert prepared a preliminary rebuttal report, which was served on January 28, 2016; in the report, he reserved the right to supplement the report after a forthcoming document production. Marianne's expert then filed the supplemental report on May 2, 2016. Because Defendant's supplemental expert report falls within the scope of his original report, Plaintiffs' application is denied. *See Cedar Petrochemicals, Inc. v. Dongbu Hannong Chem. Co.*, 769 F. Supp. 2d 269, 279 (S.D.N.Y. 2011).

In his report, Hilary's expert calculated 15 percent of the total amount that flowed into the HRH bank account during the period encompassed by his report – that is 15 percent of the money that was received by HRH.

Marianne's expert took 15 percent of a larger total. Her expert took 15 percent of the proceeds that Hilary earned through her modeling contracts, prior to the deduction of 10 percent agency fee. Hilary has had a long-standing relationship with IMG, her modeling agency. Marianne maintains that IMG charged a 10 percent agency fee that it took "off the top" of Hilary's modeling proceeds, before those funds flowed into the HRH account.

To answer the question of whether Marianne was entitled to commissions before or after any agency fee is deducted, the Court must look to terms of the 2010 Manager Agreement.

Maryland law applies to interpretation of the contract. Under Maryland law, whether a contract is ambiguous is a question of law. *Phoenix Servs. Ltd. P'ship v. Johns Hopkins Hosp.*, 892 A.2d 1185, 1223 (Md. 2006). "As a fundamental principle of contract construction, we seek to ascertain and effectuate the intention of the contracting parties." *Id.* To ascertain the parties' intent, courts "have long adhered to the objective theory of contract interpretation, giving effect to the clear terms of agreements, regardless of the intent of the parties at the time of contract formation." *Myers v. Kayhoe*, 892 A.2d 520, 526 (Md. 2006). Under the objective theory:

> A court construing an agreement under [the objective theory] must first determine from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was effectuated. In addition, when the language of the contract is plain and unambiguous there is no room for construction, and a court must presume that the parties meant what they expressed. In these circumstances, the true test of what is meant is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant.

*Gen. Motors Acceptance Corp. v. Daniels*, 492 A.2d 1306, 1310 (Md. 1985).

49

"Maryland law generally requires giving legal effect to the clear terms of a contract and bars the admission of prior or contemporaneous agreements or negotiations to vary or contradict a written contractual term." *Calomiris v. Woods*, 727 A.2d 358, 361 (Md. 1999). When a contract is clear and unambiguous, "its construction is for the court to determine." *Phoenix Servs. Ltd. P'ship* , 892 A.2d at 1223 (quoting *Wells v. Chevy Chase Bank*, 768 A.2d 620 (Md. 2001)). "A contract is not ambiguous merely because the parties do not agree as to its meaning." *Id.*

"Contractual language is considered ambiguous when the words are susceptible of more than one meaning to a reasonably prudent person." *Id.* "[T]he terms of an agreement are construed consistent with their usual and ordinary meaning, unless it is apparent that the parties ascribed a special or technical meaning to the words." *Id.* "If a trial court finds that a contract is ambiguous, it may receive parol evidence to clarify the meaning." *Phoenix Servs. Ltd. P'ship*, 892 A.2d at 1224. "Thus, while evidence of prior intentions and negotiations of the parties is inadmissible, the parol evidence rule would not bar a court from considering the context of the transaction or the custom of the trade in a determination of ambiguity." *Calomiris*, 727 A.2d at 363. Ambiguities in the interpretation of a contract should be resolved against the party that drafted the contract. *I.A. Const. Corp. v. Equiptec, Inc.*, 622 A.2d 206, 208-09 (Md. 1993).

With respect to Marianne's compensation, the 2010 Manager Agreement states:

Compensation Terms. (a) In consideration for Marianne K. Rhoda's services, Company will pay Marianne K. Rhoda, Fifteen (15%) Percent as a commission percentage of the gross income (the "Income"), received by the Company, and/or Hilary Rhoda, for Hilary's services under:

(i)     all agreements entered into the Business Management Period (which beginning in January 1, 2005);

(ii)    agreements entered into after the Business Management Period which are substantially negotiated during the Business Management Period . . . ; and

50

(iii)    any renewals, re-uses, extensions, substitutions, modifications and/or amendments of any agreement described in (i) and (ii) immediately above . . . .

(iv)    The commissions shall continue into any post management period in the same amount as the business management period (Fifteen (15% Percent) and shall continue past the business management period for a term of no less than five (5) years.

Notwithstanding anything to the contrary set forth elsewhere in this Agreement, the Commission rate for Income received by Company from Estee Lauder (15%) ("EL"), shall continue in perpetuities for any period thatthe [sic] Company, and/or Hilary Rhoda is in contract with EL.

(Giger Decl., Ex. F, Dkt. No. 144.)

Thus, the contract states that Marianne is entitled to "Fifteen (15%) Percent as a commission percentage of the ***gross income*** (the "Income"), received by the Company, and/or Hilary Rhoda." (Emphasis added.)

The 2010 Manager Contract does not define "gross income." Since the contract does not indicate the parties assigned any special or technical meaning to the term, the Court will construe "gross income" consistent with its usual and ordinary meaning.

Black's Law Dictionary defines "gross income" as, "Total income from all sources before deductions, exemptions, or other tax reductions." Gross Income, Black's Law Dictionary 881 (10th ed. 2014).

Courts have long understood "gross income" to include all income before deductions for a business' costs and expenses. For example, in *Long v. Injured Workers' Ins. Fund*, 138 A.3d 1225, 1246 (Md. 2016), the Maryland Court of Appeals considered the meaning of "gross income" or "gross receipts"[9] as distinct from "net profits." It stated that, "'gross income' and

---

[9] "Gross income" and "gross receipts" have very similar definitions. "Gross receipts" is defined as, "The total amount of money or other consideration received by a business taxpayer for goods sold or services performed in a taxable year, before deductions." Gross Receipts, Black's Law Dictionary 819 (10th ed. 2014).

'gross receipts' are figures that do not take into account any deductions." *Id.* "Thus, a business entity's "gross income" or "gross receipts" includes the business's costs and expenses." *Id.* "By contrast, 'net profit' is '[t]otal sales revenue less the cost of the goods sold and all additional expenses.'" *Id.* (quoting Net Profit, Black's Law Dictionary 1404 (10th ed. 2014)).

For tax purposes, the U.S. Tax Court has recognized agency fees as deductions that are part of "gross income." In *Bartlett v. C.I.R.*, 74 T.C.M. (CCH) 583, 1997 WL 573488 (T.C. 1997), the court considered whether the petitioner, who acted as a part-time model, was entitled to relief from joint liability on her and her former husband's tax return. In discussing the petitioner's gross income in a given year, the court stated that the petitioner had $3,700 in gross income from television commercial residuals and had "$3,058 in total deductions, including agency fees and modeling expenses, that were attributable to her business activities that year." *Id.* Thus, the court concluded that the petitioner's net contribution to her taxable income was $642. *Id.*

The term "gross income," in its ordinary meaning, would include all of Hilary's proceeds from her modeling contracts, prior to the deduction of any costs and expenses, such as an agency fee. Accordingly, Marianne was entitled to 15 percent of Hilary's income *before* any agency fee was deducted.

Although the 2010 Manager Agreement is unambiguous with respect to the term "gross income," genuine issues of material fact preclude the Court from granting summary judgment on Plaintiffs' claim. Neither Plaintiffs' nor Marianne's experts provides an accurate calculation of Marianne's commissions.

Plaintiffs' expert, Krant, miscalculates Marianne's commissions because his accounting takes 15 percent of a base number that does not include IMG's agency fees.

52

Although Marianne's expert, Barsky, took 15 percent of a base number that does include agency fees, he applied an "Assumed Agency Fee" of 10 percent on all inflows into HRH's bank account. (Krant Decl., Schedule H, Dkt. No. 124.) Unfortunately, the agency fees actually charged by IMG and subject to Marianne's commission cannot be "assumed;" they must be proven by her. Given the existing record, there are genuine issues of material fact as to whether IMG, or any other agency, actually took a 10 percent fee across the board (as opposed to some other rate) on Hilary's income within the period covered by the statute of limitations. The record only contains an IMG contract indicating that IMG's commission was 10 percent during the contract period, which ended on February 8, 2010 (or at latest on February 11, 2011, if the contract was renewed for an additional year). The Court does not know, based on the existing record, if and by how much IMG's commission rate might have changed after the IMG contract ended. There is also insufficient evidence to conclude that Plaintiffs had a continuing exclusive relationship with IMG after the contract's expiration.

The IMG contract itself indicates that IMG may have had commission rate structures other than the standard 10 percent for Hilary's services after the contract period ended. For instance, the IMG contract states that IMG is entitled to receive commissions from any agreements for Hilary's services formed during the contract period but that are renewed, extended, or modified after the contract expires – and its commission rate on these agreements decreases based on the numbers of years that have passed since the expiration of the IMG contract. Additionally, the IMG contract states that IMG's commissions on the Estee Lauder agreement shall be renegotiated with a downward reduction if it is extended past its second renewal period. In the absence of evidence that IMG *actually* deducted a 10 percent fee "off the

53

top" of all inflows into HRH's account during the limitations period, genuine issues of material
fact preclude summary judgment on this claim.

For the reasons stated above, Plaintiffs' motion for partial summary judgment on
Marianne's overpayment of commissions is denied.

### 2. Marianne's Use of HRH Corporate Accounts to Pay Unwarranted "Expenses"

In addition to overpaying herself commissions, Plaintiffs claim that Marianne used
corporate funds to pay for various personal expenses. This is a second and separate aspect of
Plaintiffs' breach of fiduciary duty claim.

Plaintiffs present the Court with a list of expenses that they challenge as either actually or
arguably improper. To the extent that Plaintiffs' breach of fiduciary duty claim arises from these
improper expenses, the Court cannot dispose of it on summary judgment. Genuine issues of
material fact exist as to whether certain expenses were either paid for Hilary's benefit, which
would make them reimbursable, or were otherwise legitimate work-related expenses. Moreover,
any such claim is subject to the three-year statute of limitations, so the expert reports, which
cover a seven-year period, must be recalculated. With respect to at least one category of
expenses, the experts have not even identified the expenses by date of incurrence. They will have
to do so when they update their reports in advance of trial.

Nonetheless, some expenses can be identified as improperly charged to HRH on the
record presently before the Court.

### a. Improper Credit Card Expenses

Plaintiffs claim that Marianne charged a number of personal, non-business expenses to
her HRH credit card and allowed her son, Spencer, and her boyfriend, Newman, to do the same.

These expenses – which Marianne concedes are not legitimate business expenses – were improperly charged to Plaintiffs.

### i. Credit Card Expenses Incurred by Spencer

First, Plaintiffs contend that Marianne permitted Spencer, who never worked for HRH, to use the company credit card for his own personal expenses. If a three-year statute of limitations applies, the report by Plaintiffs' expert indicates that Spencer incurred $32,692 in charges from August 2011 to February 2014. For this period, Marianne's expert disputes only a single charge of $127.70, which he claims was an "account credit." (Barsky Decl., Schedule E-3, Dkt. No. 153.) Thus, aside from this one charge, Marianne does not dispute that she permitted Spencer to make the remainder of the personal expenses alleged by Plaintiffs.

Moreover, Marianne admits that Spencer's credit card charges were not legitimate business expenses. At her deposition, she testified that Spencer never worked for HRH and that charges incurred by Spencer were not business expenses. (M. Rhoda Dep. 27:5-13.) When asked who authorized personal expenses to be charged to the HRH credit cards, Marianne testified that she herself authorized the charges. (*Id.* at 22:11-24.) Marianne's only justification for Spencer's expenses is that she ultimately paid HRH back for those expenses out of her own salary. (*Id.* at 29:10-22.)

The issue of repayment is all that prevents the Court from awarding summary judgment to Plaintiffs. The jury will be instructed that Spencer's expenses were not legitimate charges to the company; Marianne bears the burden of proving that she actually repaid the corporation for her improper charges.

55

### ii. Credit Card Expenses Incurred by Newman

Second, Plaintiffs contend that Marianne permitted her boyfriend, Anthony Newman, to use the HRH credit card for his own personal expenses. Although Newman's alleged expenses – like those incurred by Spencer – appear to be improper non-business expenses, they were all incurred in 2008. Newman's expenses therefore fall outside either a three-year limitations period. Any claim that Plaintiffs might have had to recover these expenses under a breach of fiduciary duty theory is time-barred on its face.

### iii. Credit Card Expenses Incurred by Marianne

Third, Plaintiffs contend that Marianne incurred a number of charges on the HRH credit card for her own personal expenses.

Under a three-year statute of limitations, the report by Plaintiffs' expert indicates that Marianne incurred $141,391 in HRH credit card charges between August 2011 and February 2014. (Krant Decl., Ex. 5, Dkt. No. 124.) According to the report prepared by Marianne's expert, $41,589.10 in charges on Marianne's HRH credit card during that same period were made for Hilary's benefit. (Barsky Decl., Schedule E-1, Dkt. No. 153.)

Because Marianne was Hilary's business manager and the corporate officer responsible for HRH's accounts and finances, any expenses that Marianne incurred for Hilary's benefit could be reimbursable. The 2010 Manager Agreement, which was between "Marianne K. Rhoda and HRH Group, Inc., a/k/a Hilary Rhoda," gives Marianne the authority to

> maintain and control accounts for the deposit of all income received by HRH Inc., and/or Hilary Rhoda; review, examine, billing documents including: receipts for payment, receipts for repayment of expenses, invoices and any and all other documents relating to any to Company; and, distribute all salary/compensation to individuals listed in 1(iii) above, as well as Marianne K. Rhoda and Hilary Rhoda.

(Giger Decl., Ex. F, Dkt. No. 144.)

56

Although the 2005 Manager Agreement provided that Marianne had to pay for her own out-of-pocket expenses, the 2010 Manager Agreement does not contain any similar provision. The 2005 Manager Agreement stated that "all out-of-pocket expenses (travel, room and board, etc.) for Marianne Rhoda, personally, that have otherwise been paid for by the client of IMG Models, Inc., or any subsequent agency hired to represent the interests of Hilary Rhoda, shall be the Responsibility of Marianne Rhoda." (Giger Decl., Ex. E, Dkt. No. 144.) This provision is absent from the 2010 Manager Agreement. Thus, any business expenses that Marianne incurred, along with any expenses she incurred for Hilary, are arguably proper. Because the Court cannot resolve on a motion for summary judgment whether these expenses were in fact proper, these disputed amounts will be issues left for trial.

Apart from charging business expenses, Marianne admitted at her deposition that she also used her HRH corporate card for personal expenses. (M. Rhoda Dep. 483:3-484:23) She has not submitted any evidence tending to show that her personal expenses related to the business of Hilary or HRH, and nothing in the 2010 Manager Agreement permits Marianne to use corporate funds for personal expenses. Like the charges for her son, Spencer, these expenses were not properly charged to HRH, and the jury will be so instructed.

Marianne again testified that she ultimately paid HRH back for these expenses by taking a corresponding reduction in her commissions. She bears the burden of proof on this issue.

### b. Check and Debit Card Expenses Incurred by Marianne

Plaintiffs argue that Marianne wrote checks and incurred debit card charges for non-business purposes using HRH funds. These expenses, according to Plaintiffs, included shopping

57

purchases, divorce attorney's fees, short-term loans, gym membership fees, and home construction expenses. (Krant Decl. ¶ 33, Dkt. No. 124.)

Because Krant's report goes back seven years from the date that Plaintiffs filed their complaint, some of the allegedly improper check and debit card expenses included in his report very likely occurred outside of the limitations period. However, because neither he nor Barsky identifies these expenses by date, the Court cannot tell which are subject to Plaintiffs' claim and which are time-barred. Thus, the Court cannot grant summary judgment on this category of expenses that Plaintiffs allege to be improper.

### c. Loan to Marianne's Parents

Plaintiffs claim that Marianne took out a "temporary loan" in the amount of $344,693 from the HRH savings account. (Krant Decl., Ex. 9, Dkt. No. 124.) According to Marianne, the loan was to pay for an assisted living facility for her parents. Both export reports indicate that the funds for this loan were transferred in June 2011. (Krant Decl., Ex. 9, Dkt. No. 124; Barsky Decl., Schedule G, Dkt. No. 153.)

Marianne contends that she has partially repaid this loan. According to her expert, Marianne repaid $100,000 in April 2013 and $194,000 in June 2013. (Krant Decl., Schedule G, Dkt. No. 124.) As for the remainder of the balance on the loan, Marianne testified that she took a reduction in her salary equal to that balance. (M. Rhoda Dep. 88:23-15, 89:1-3.)

Marianne has submitted no evidence to show that Hilary owed her grandparents any duty of support and no evidence that Hilary authorized Marianne to use her or HRH's money to care for her grandparents. Thus, the self-dealing loan was improperly obtained by Marianne in breach of her fiduciary duties. Marianne took out this loan in June 2011, but the money remained due and owing, in whole (until at least April 2013) and possibly in part (if indeed Marianne made any

58

repayments, which is a question for the jury). Nothing in the record establishes the terms of the

loan or when repayment was due, or what interest rate was charged. Marianne's failure to repay

the loan in full and her continuing use of the money damaged Plaintiffs, because it prevented

them from using those funds. Although Marianne testified that she ultimately paid the balance on

the partially repaid loan by taking a corresponding reduction in her commissions, there is nothing

in the record showing when, or if, she took this reduction.

Thus, there are a number of genuine issues of material fact that preclude summary

judgment.

### d. Other Allegedly Improper Expenses

Plaintiffs contend that Marianne engaged in a number of other improper transactions.

However, many of these transactions are more than three years old. For instance, the report by

Plaintiff's expert includes the following transactions:

i. $14,248 in credit card charges for clothing and retail purchases at Neiman-Marcus in 2009, (Krant Decl., Ex. 5, Dkt. No. 124);

ii. An October 2008 wire transfer of $23,118.45 to pay for Spencer's college tuition at the University of Pennsylvania, (*Id.*, Ex. 9);

iii. An October 2008 wire transfer of $14,345.21 to a payee by the name of Skandinaviska E. Nskilda, (*Id.*); and

iv. An unidentified transfer in August 2007 from the HRH checking account in the amount of $5,350, (*Id.* ¶ 38).

Because these transactions, along with many others alleged by Plaintiffs to be improper,

predate a three-year limitations period, any claim that Plaintiffs might have had to recover on

these transactions are time-barred on their face.

59

### e. Transfer of HRH Funds into Marianne's 401(k) Account

Finally, Plaintiffs assert that, from 2007 to February 2014, Marianne transferred

$228,200 from the HRH checking account into her 401(k) account. (Krant Decl. ¶ 43, Dkt. No.

124.) Plaintiffs claim that these transfers were in excess of the 15 percent commission to which

Marianne was entitled. (*Id.* ¶ 44.)

Marianne has cross-moved for partial summary judgment on her counterclaim that

Plaintiffs denied her benefits under HRH's ERISA-governed plans. The propriety of the transfers

that Marianne made to her 401(k) account depends on whether she was entitled to participate in

the 401(k) Plan – a question that is central to Marianne's cross-motion. The issue will be

discussed below.

### 3. Defendant's Remaining Defenses

Marianne contends that any damages she owes Plaintiffs should be "offset" by money

that they still owe her – principally from unpaid commissions and from money that Marianne

had "advanced" to Hilary earlier in her career.

These include:

(1) $130,400 in unpaid commissions owed to Marianne for the years 2005 and 2006, (Barsky Decl. ¶ 65, Dkt. No. 153);

(2) $4,689 in credit card charges incurred for Hilary's benefit prior between April 2005 and February 2007 (*Id.*, Schedule E-2);

(3) $93,100 in rent and utilities payments for Hilary's New York City apartment between September 2005 to the end of 2006, (*Id.* ¶¶ 53-55);

(4) $33,714 in payments for Hilary's benefit (which includes items such as travel and office expenses, cash withdrawals, and expenses for furnishing Hilary's apartment) from Marianne's Bank of America account from 2005 to 2007, (*Id.* ¶¶ 56-58); and

(5) $75,000 in a 2006 settlement payment to resolve a lawsuit brought by Click Model Management, Inc. against Hilary, (*Id.* ¶ 62).

Unfortunately, Marianne's argument that Plaintiffs' damages should be adjusted for these items fails, because any claim to recover on the above transactions is time-barred.

Any claim that Marianne has to recover unpaid commissions for 2005 and 2006 arises from the 2005 Manager Agreement and is subject to the contract's Maryland choice-of-law provision. In Maryland, a breach of contract claim is subject to a statute of limitations of three years. Md. Code Ann., Cts. & Jud. Proc. § 5-101; *see Curry v. Trustmark Ins. Co.*, 600 F. App'x 877, 880 (4th Cir. 2015). Thus, Marianne's claims for unpaid commissions from 2005 and 2006 were long since expired by the time that Plaintiffs initiated this action on August 20, 2014. She is, therefore, not entitled to any "offset" as a result of these unpaid commissions.

Any claim that Marianne has to recover funds that she "advanced" to Hilary, with the expectation of repayment, prior to 2007 does not arise from the 2005 Manager Agreement. Nothing in that contract requires Plaintiffs to pay Marianne back for money that she advanced for Hilary's personal or business expenses. Thus, Marianne would have only a quasi-contract claim – a claim for unjust enrichment – to recover these amounts. Because quasi-contract claims fall outside the scope of the contractual choice-of-law provision, New York's conflict of law rules apply. Under these rules, "the law governing a claim for restitution to recover for unjust enrichment is that of the state which, with respect to each issue, 'has the most significant relationship to the occurrence and the parties.' Factors to be taken into account in this grouping of contacts approach . . . include 'the place where the benefit or enrichment was received,' 'the place where the act conferring the benefit or enrichment was done,' and the domicile and place of business of the parties." *In re Rezulin Prod. Liab. Litig.*, 390 F. Supp. 2d 319, 341 (S.D.N.Y. 2005) (quoting Restatement (Second) Of Conflict Of Laws § 221). Under this analysis,

61

Marianne's quasi-contract claim to recover money that she advanced to Hilary is governed by

New York law.

In New York, unjust enrichment claims are subject to a six-year limitations period.

CPLR § 213(1). By the time that Plaintiffs filed suit on August 20, 2014, the statute of

limitations prevented Marianne from recovering any money that she advanced to Hilary prior to

August 20, 2008. Because the items she identifies all occurred prior to August 20, 2008,

Marianne is barred from recovering them. She is, therefore, not entitled to an offset for these

expenses.

Marianne also claims that her damages should be adjusted for payments that she made on

behalf of Hilary and for unpaid commissions that may fall within the limitations period. These

include:

(1) $68,452 in payments for Hilary's benefit (which includes items such as travel and food expenses) from Marianne's Bank of America account from January 2008 to January 2014, (Barsky Decl. ¶¶ 59-61, Dkt. No. 153);

(2) $22,078 in payments made for Marianne's health insurance from April 2010 to January 2014, (*Id.* ¶ 64);

(3) $339,725 in savings on hotel costs when Marianne used her own New York City apartment in lieu of hotels and an office while in New York on business from June 2008 to the end of 2013, (*Id.* ¶ 63, Schedule L); and

(4) $477,032 in estimated commissions owed to Marianne for the period February 2014 (after the termination of Marianne's business relationship with Hilary) to November 31, 2016 (the end date of the 2010 Manager Agreement), (*Id.* ¶ 68).

Nothing in the 2010 Manager Agreement or any other document in the current record

indicates that Marianne was entitled to payment from HRH for her personal health insurance or

for savings on hotel costs. To the extent Marianne claims that she properly reimbursed herself for

payments she made on Hilary's behalf within the limitations period, she may present evidence at trial.

Marianne has filed a counterclaim to recover the unpaid commissions owed to her under the 2010 Manager Agreement. (Answer and Countercls., Dkt. No. 35.) However, she has not moved for summary judgment on that counterclaim, and the Court will not consider it in deciding Plaintiffs' instant motion.

Ultimately, because the experts must update their reports to reflect the applicable statute of limitations and because a number of genuine issues of material fact remain, the Court cannot grant summary judgment on Plaintiffs' claim.

### III.     Defendant's Motion for Partial Summary Judgment

Marianne moves for partial summary judgment to recover denied benefits under the Defined Benefit Plan and the 401(k) Plan, pursuant to 29 U.S.C. § 1132(a)(1)(B). In their briefs on this motion, the parties have devoted nearly all of their attention to whether HRH's decision to deny Marianne's claim should be overturned because it was arbitrary and capricious. However, the Court cannot direct summary judgment on that issue – and in large part, because the parties have failed to supply the Court with an adequate record with which it may review HRH's decision. Moreover, Plaintiffs have raised a defense of unclean hands in their answer to Marianne's counterclaims, but have not raised the defense in responding to Marianne's motion. In any event, the defense is preserved; the Court finds that there are disputed issues of fact related to the defense of unclean hands that will be decided at trial.

Marianne's motion for partial summary judgment to recover denied benefits under HRH's ERISA-governed plans is denied.

### A. Standard of Review

"[A] denial of benefits challenged under [ERISA] is to be reviewed under a *de novo*
standard unless the benefit plan gives the administrator or fiduciary discretionary authority to
determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber
Co. v. Bruch*, 489 U.S. 101, 115 (1989). "Where the written plan documents confer upon a plan
administrator the discretionary authority to determine eligibility, we will not disturb the
administrator's ultimate conclusion unless it is arbitrary and capricious." *Pagan v. NYNEX
Pension Plan,* 52 F.3d 438, 441 (2d Cir.1995) (internal quotations omitted). The fiduciary has
the burden of proving that a more deferential standard applies. *See Kinstler v. First Reliance
Standard Life Ins. Co.,* 181 F.3d 243, 249 (2d Cir. 1999).

"Under the arbitrary and capricious standard, the scope of judicial review is narrow."
*Celardo v. GNY Auto. Dealers Health & Welfare Trust*, 318 F.3d 142, 146 (2d Cir. 2003). "A
court may overturn a plan administrator's decision to deny benefits only if the decision was
'without reason, unsupported by substantial evidence or erroneous as a matter of law.'" *Id.*
(quoting *Pagan*, 52 F.3d at 442). "Substantial evidence is 'such evidence that a reasonable mind
might accept as adequate to support the conclusion reached by the [administrator and] . . .
requires more than a scintilla but less than a preponderance.'" *Id.* (quoting *Miller v. United
Welfare Fund*, 72 F.3d 1066, 1072 (2d Cir. 1995)). "[T]he question for [the] court is not whether
[the plan administrator] made the 'correct' decision [but] whether [it] had a reasonable basis for
the decision that it made." *Hobson v. Metro. Life Ins*. Co., 574 F.3d 75, 89 (2d Cir. 2009).

Both the Defined Benefit Plan and the 401(k) Plan contain classic *Firestone* language,
vesting authority in the administrator to construe the terms of the plan and to make benefits

determinations. Accordingly, the Court reviews HRH's decision under an arbitrary and capricious standard.

### B. Conflict of Interest

Under the highly deferential arbitrary and capricious standard, the scope of this Court's review is limited. The Court "may not upset a reasonable interpretation by the administrator." *Jordan v. Ret. Comm. of Rensselaer Polytechnic Inst.*, 46 F.3d 1264, 1271 (2d Cir. 1995). However, the deference owed to an administrator's determination is diminished when there is a conflict of interest. *See Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008).

Here, Marianne contends that HRH had a structural conflict that actually influenced its decision to deny her request for disbursement of funds from the company employee benefit plans. Although the arbitrary and capricious standard is ordinarily a highly deferential one, Marianne urges the Court to take a more scrutinizing look at HRH's determination in light of its conflict of interest and to overturn that decision.

HRH did, indeed, have a structural conflict of interest. It was "a plan administrator that both evaluate[d] claims for benefits and [paid] benefits." *Glenn*, 554 U.S. at 112. "[T]he existence of that kind of conflict is certainly a factor to be weighed, but it does not, by itself, require the court to review the plan administrator's benefit decision on a *de novo* basis." *Hobson v. Metro. Life Ins. Co.*, 574 F.3d 75, 89 (2d Cir. 2009) (quoting *McCauley v. First Unum Life Ins. Co.*, 551 F.3d 126, 133 (2d Cir. 2008)).

The weight properly accorded to an alleged conflict of interest "varies in direct proportion to the 'likelihood that [the conflict] affected the benefits decision.'" *Durakovic v. Bldg. Serv. 32 BJ Pension Fund*, 609 F.3d 133, 139 (2d Cir. 2010) (quoting *Glenn. Anderson v. Suburban Teamsters of N. Ill. Pension Fund Bd. of Trs.*, 588 F.3d 641, 648 (9th Cir. 2009)). A

conflict of interest "proves more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration." *Glenn*, 554 U.S. at 117. "It should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits." *Id.*

Although the record indicates that HRH engaged Thomas Barrett of NERT as the third-party administrator for its Plans, when it came to adjudicating Marianne's claim, HRH insisted on administering the claim itself. Once HRH learned that Marianne had requested a disbursement of funds from the Plans, HRH's counsel on ERSIA-related matters, Harders, demanded all documentation related to Marianne's claim and took over claim administration. There is no indication in the record that Barrett remained involved in claim administration after handing the claim over to Harders and her colleagues. Nothing else in the record indicates that HRH took any steps to reduce bias or to promote accuracy in the claim administration process. Finally, Plaintiffs commenced this lawsuit against Marianne during the pendency of HRH's administrative review of Marianne's claim – a circumstance that would increase the likelihood of biased claims administration.

The Court finds that a conflict of interest exists and should be afforded weight in reviewing HRH's benefits determination.

## C. Administrative Record

It has become manifestly evident that the administrative record submitted for the Court's review is incomplete. The inadequacy of the record makes it impossible for the Court to review, even under an arbitrary and capricious standard, HRH's decision to deny Marianne benefits.

First, Harders indicates in her affidavit that in considering Marianne's claim, she and her colleagues performed a "comprehensive investigation" and reviewed all pertinent plan documents, all available annual tax filings of HRH, and all materials submitted by Marianne in support of her distribution request, including HRH's corporate governing documents. (Harders Decl. ¶ 19, Dkt. No. 143.) However, aside from the 2012 W-2 forms for Hilary and Marianne and Forms 5500 for the Plans for years 2012, 2013, and 2014, the parties have not submitted any other HRH tax documents for the Court's review.

Marianne claims that she was employee of HRH and received W-2 forms from HRH every year since 2007. (*See* Ehrenberg Decl., Ex. 11, Dkt. No. 118.) She also indicates that she submitted her 2008 and 2012 W-2 forms to HRH during the administrative review. (Def.'s 56.1 Statement ¶ 45.) However, the existing record only contains Marianne's W-2 form from 2012; it does not contain her W-2 forms for any other year. The absence of the remainder of these W-2 forms makes it impossible for the Court to determine, based on the existing record, whether HRH's benefits determination was arbitrary and capricious.

Indeed, Marianne's employment status – whether she was an HRH employee or merely an independent contractor – is critical to the determination of whether she was entitled to benefits under the Defined Benefit Plan or the 401(k) Plan. Marianne's receipt of W-2 forms from HRH is highly probative of her status as an employee, instead of as an independent contractor.

67

For instance, the 2012 version of the Defined Benefit Plan states:

> The term Covered Employee means all Employees known as Marianne Rhoda are Eligible Employees. **Notwithstanding the foregoing, the term "Covered Employee" shall not include the following: (a) any individual with respect to whom [HRH] does not withhold income or employment taxes and file Form W-2** (or any replacement Form) with the Internal Revenue Service because such individual has executed a contract, letter of agreement, or other document acknowledging his status as an independent contractor, even if such individual is later adjudicated to be a common law employee of [HRH], unless and until [HRH] extends coverage to such individual . . . .

(Ehrenberg Decl., Ex. 4 § 2.11, Dkt. No. 118 (emphasis added).) By the plan's terms, Marianne

is covered *unless* HRH did not withhold income taxes for her and did not issue her W-2 forms

because of her status as an independent contractor. Without evidence of Marianne's W-2 forms

for any year aside from 2012 (or evidence that HRH *did not* issue W-2 forms to her for these

other years), the Court simply cannot determine whether HRH's denial of her claim under the

Defined Benefit Plan was arbitrary and capricious.

Similarly, the 401(k) Plan states that HRH "employees," but not "independent

contractors," are eligible to participate. The plan defines "employee" to mean:

> (a) [A]ny person who is reported on the payroll records of the Employer as an employee and who is deemed by the Employer to be a common law employee; (b) any person who is reported on the payroll records of an Affiliated Employer as an employee and who is deemed by the Affiliated Employer to be a common law employee of the Affiliated employer . . . (c) any Self-Employed Individual who derives Earned Income from the Employer; and (d) any person who is considered a Leased Employee . . . However, the term 'Employee' will not include an Independent Contractor.

(Ehrenberg Decl., Ex. 5 § 1.65, Dkt. No. 118.) The plan does not define what constitutes "payroll

records," and the record before the Court does not contain any document resembling a payroll

record. However, employer-issued W-2 forms are evidence of the compensation paid to an

employee; they are also evidence of a common law employer-employee relationship. Again,

without a complete record, including the relevant W-2 forms issued to Marianne (if they exist),

the Court cannot determine whether HRH's denial of Marianne's claim under the 401(k) Plan was arbitrary and capricious.

Although Harders testified that she and her team reviewed Marianne's W-2 "forms" (plural) during the claims administration process, the Court does not know *which* W-2 forms they reviewed or whether they reviewed a complete record of these tax documents. The Court certainly *does not* have a complete record of them, just as it does not have a record of many of the documents allegedly considered at the administrative review stage.

The incompleteness of the record before the Court precludes summary judgment on Marianne's counterclaim for denied benefits under HRH's Defined Benefit Plan and 401(k) Plan. And to the extent that the administrative record below was also incomplete, the Court will expand its review at trial beyond the administrative record.

"A district judge may expand its review of an administrative decision beyond the record in front of the claims administrator upon finding 'good cause' warranting the introduction of additional evidence." *Krizek v. Cigna Grp. Ins.*, 345 F.3d 91, 97-98 (2d Cir. 2003) (quoting *Zervos v. Verizon, N.Y., Inc.*, 277 F.3d 635, 646 (2d Cir. 2002)). "The decision whether to consider evidence beyond the administrative record lies in the discretion of the district court and is not disturbed absent an abuse of that discretion." *Id.*

"[T]he incompleteness of an administrative record might – under certain circumstances – constitute good cause for hearing additional evidence." *Zervos v. Verizon New York, Inc.*, 277 F.3d 635, 646-67 (2d. Cir. 2002). In *Zervos*, however, the Second Circuit concluded that the review of the evidence should be limited to the administrative record because the record before the insurance company at the time that it made its determination was not incomplete. *Id.* Thus,

the Second Circuit refused to consider, on appeal, testimony by the insurance company's experts
obtained only after the lawsuit was filed.

Marianne alleges – and the Court agrees – that HRH operated under a conflict of interest.
A "demonstrated conflict of interest in the administrative reviewing body" can constitute "good
cause." *DeFelice v. Am. Int'l Life Assurance Co. of N.Y.*, 112 F.3d 61, 67 (2d Cir. 1997);
*Sheehan v. Metro. Life Ins. Co.*, No. 01 CIV. 9182, 2002 WL 1424592, at *4 (S.D.N.Y. June 28,
2002). The plaintiff has the burden of establishing that the plan administrator was sufficiently
conflicted so as to expand the administrative record. *Krizek*, 345 F.3d at 97. To the extent that
there is evidence outside of the administrative record relevant to HRH's conflict of interest and
the impact of that conflict on HRH's determination, the Court will consider such evidence at
trial.

### D. Defenses

The Court cannot direct summary judgment on Marianne's counterclaim for an additional
reason: Plaintiffs have raised an affirmative defense of unclean hands, and there are genuine
issues of material fact that preclude judgment as a matter of law as to that defense.

Although Plaintiffs raised the affirmative defense of unclean hands in their Answer to
Marianne's ERISA counterclaims, they did not raise the defense in their opposition to
Marianne's motion for partial summary judgment. But it is an available defense in this case.
Indeed, federal courts have considered and applied the doctrine of "unclean hands" to bar a
plaintiff's recovery in ERISA actions. *See Anweiler v. American Elec. Power Serv. Corp.*, 3 F.3d
986, 993 (7th Cir. 1993); *Ellenburg v. Brockway, Inc.*, 763 F.2d 1091, 1097 (9th Cir. 1985); *see
also Ries v. Humana Health Plan, Inc.*, No. 94 C 6180, 1995 WL 669583, at *5 (N.D. Ill. Nov. 8,
1995).

The doctrine of unclean hands "closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief . . . ." *Ellenburg*, 763 F.2d at 1097 (internal quotation marks omitted). The doctrine is applicable when (1) a party seeking affirmative relief (2) is guilty of conduct involving fraud, deceit, unconscionability, or bad faith (3) directly related to the matter in issue (4) that injures the other party (5) and affects the balance of equities between the litigants. *See Precision Instrument Mfg. Co. v. Automotive Maintenance Mach. Co.*, 324 U.S. 806, 814-15 (1945); *Holm v. First Unum Life Ins. Co.*, 7 F. App'x 40, 41 (2d Cir. 2001); *Ciba–Geigy Corp. v. Bolar Pharmaceutical Co.*, 747 F.2d 844, 855 (3d Cir.1984), *cert. denied* 471 U.S. 1137 (1985); *International Union, Allied Industrial Workers v. Local* 589, 693 F.2d 666, 672 (7th Cir. 1982); *Mitchell Bros. Film Group v. Cinema Adult Theater*, 604 F.2d 852, 863 (5th Cir. 1979), *cert. denied*, 445 U.S. 917 (1980).

"In applying the doctrine, 'What is material is not that the plaintiff's hands are dirty, but that he dirtied them in acquiring the right he now asserts, or that the manner of dirtying renders inequitable the assertion of such rights against the defendants.'" *Ellenburg*, 763 F.2d at 1097 (quoting *Republic Molding Corp. v. B.W. Photo Utilities,* 319 F.2d 347, 349 (9th Cir. 1963)). Application of the defense of unclean hands rests in the Court's discretion, and in exercising that discretion the public interest is of paramount importance. *See Precision Co.*, 324 U.S. at 815, 65.

In *Ellenburg v. Brockway, Inc.*, 763 F.2d 1091, 1094 (9th Cir. 1985), the Ninth Circuit applied the doctrine of unclean hands in an ERISA action to bar the plaintiff from recovering early retirement benefits under a pension plan governed by ERISA. *Id.* At the time that the plaintiff applied for benefits, he had not attained the age for early retirement eligibility. *Id.* However, in documents filed in connection with his application for benefits, the plaintiff stated that his date of birth was three years earlier than his true date of birth. *Id.* After the plan trustees

71

determined that the plaintiff's date of birth was incorrect, they denied early retirement benefits to the plaintiff, and the plaintiff sued to recover the benefits. *Id.* The Ninth Circuit affirmed the district court's judgment in favor of the plan trustees because the plaintiff proceeded in bad faith in applying for early retirement benefits when he knew he was not age eligible. *Id.* at 1097. The court noted that the plaintiff's true date of birth was known to him. *Id.* It therefore concluded that when the plaintiff submitted documents he knew to be in conflict with other records of his birth date in an attempt to receive retirement benefits, he "acted in bad faith with respect to his early retirement benefits, the right which he now asserts against [the defendants]." *Id.* Because the plaintiff "dirtied his hands in acquiring the right he now asserts," the Ninth Circuit concluded that equity barred him from equitable relief. *Id.*

In *Anweiler v. Am. Elec. Power Serv. Corp.*, 3 F.3d 986, 988 (7th Cir. 1993), the plaintiff alleged that the defendants breached their fiduciary duties under ERISA and sought imposition of a constructive trust on insurance policy proceeds as equitable relief under 29 U.S.C. § 1132(a)(3). The Seventh Circuit relied on the doctrine of unclean hands to conclude that the plaintiff was not entitled to such equitable relief since the record showed that she did not come with clean hands. In that case, the plaintiff's husband received double disability benefits – from his insurance company and the Social Security Administration – for a period of six years before the insurance company learned of this fact, which resulted in the insurance company's overpayment of benefits to him. The Court stated that it was "obvious from plaintiff's own arguments that she knew at the time that her husband should not receive double benefits." *Id.* at 993. Accordingly, the court concluded that, "[D]espite defendants' breach of fiduciary duties, plaintiff has no equitable claim to the proceeds from [her husband's] life insurance policy." *Id.*

72

The Second Circuit has also considered the defense of unclean hands in an ERISA action. In *Holm v. First Unum Life Ins. Co.*, 7 F. App'x 40, 41 (2d Cir. 2001) (summary order), the plaintiff appealed the district court's decision granting summary judgment to the defendant, based on the plaintiff's failure to exhaust his administrative remedies. The plaintiff asserted that the defendant insurance company had unclean hands because it was late in notifying him that his claim for disability benefits was denied. *Id.* He further asserted that it would be inequitable for the defendant to defeat his cause of action based on untimeliness when it also did not meet notice deadlines proscribed in the plan. *Id.* Although the Second Circuit considered the doctrine of unclean hands, it concluded that the doctrine was inapplicable to the defendant on the facts of that case, because the defendant was "neither a plaintiff seeking to open the 'doors of a court of equity,' nor a party seeking any affirmative relief from the court, such as by asserting a counterclaim." *Id.* In any event, the court ruled that even if the doctrine where somehow applicable to the defendant, the record did not indicate that the defendant's delay could be characterized as a "'transgress[ion] [of] equitable standards of conduct," or otherwise unfair, fraudulent or deceitful." *Id.* (quoting *Precision Instrument Mfg. Co.*, 324 U.S. at 814-15). Instead, the court found that the defendant's delay in reaching the decision to deny benefits was primarily to due to the plaintiff and his doctor's failure to provide necessary medical information. *Id.*

In this case, although there are significant disputes of fact, the record supports a defense of unclean hands that Plaintiffs may assert at trial.

First, Marianne seeks affirmative relief from the Court and seeks to open "the doors of a court of equity." In *Sullivan v. LTV Aerospace & Def. Co.*, 82 F.3d 1251, 1258-59 (2d Cir. 1996), *abrogated on different grounds by McCauley v. First Unum Life Ins. Co.*, 551 F.3d 126

73

(2d Cir. 2008), the Second Circuit joined its sister courts in finding that there is no right to a jury trial in a suit brought to recover ERISA benefits, because the plaintiffs' claim was equitable in character. Despite the fact that the plaintiffs were seeking damages under Section 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), in the amount of severance benefits to which they were allegedly entitled, the relief sought was equitable in nature and was therefore not triable by a jury. In reaching this conclusion, the court found persuasive that:

> The significance of the [arbitrary and capricious] standard, while second nature to a judge, is not readily communicated to jurors. Moreover, the presumption of correctness that attaches to private administrative action here is incompatible with a jury trial scheme. Courts addressing this issue have almost uniformly held that under the common law of trusts proceedings to determine rights under employee benefit plans are equitable in character and thus a matter for a judge, not a jury.

*Id.* (quoting *Berry v. Ciba-Geigy Corp.*, 761 F.2d 1003, 1006 (4th Cir. 1985)).

Accordingly, courts in this Circuit have recognized that an action for ERISA plan benefits under § 502(a)(1)(B) of ERISA – whether the *de novo* standard or arbitrary and capricious standard applies – is one that arises out of equity. *See e.g.*, *DeFelice*, 112 F.3d at 65; *Murphy v. First Unum Life Ins. Co.*, No. 15 Civ. 820, 2016 WL 526243, at *4 (E.D.N.Y. Feb. 9, 2016); *Four Winds, Inc., v. Travelers Ins. Co.*, No. 93 CIV. 4282, 1995 WL 640476, at *4 (S.D.N.Y. Nov. 1, 1995).

Here, Marianne seeks affirmative relief from this Court with respect to the counterclaim to recover benefits owed to her under the Defined Benefit Plan and the 401(k) Plan.

Second, the record indicates that there are genuine issues of material fact as to whether Marianne's conduct amounted to fraud, deceit, unconscionability, or bad faith. Plaintiffs have submitted evidence suggesting Marianne's bad faith and deceit. Hilary submitted a sworn affidavit indicating that Marianne set up the Defined Benefit Plan and the 401(k) Plan without

74

Hilary's approval and that Marianne certified that there were HRH board resolutions adopting the Plans, even while Hilary, a board member, never approved any such resolution. Although Hilary was aware that Marianne had created a company retirement plan, she testified that Marianne told her that she (Hilary) would be the plan's sole beneficiary. However, according to Plaintiffs, Marianne named herself as a participant in one of the Plans without Hilary's consent and transferred company funds, to which she had no entitlement, into the retirement plans in her name. Marianne disputes this narrative. Marianne testified that Hilary was aware that both she and Marianne were entitled to participate in the Plans. According to Marianne, Hilary knew that Marianne made contributions to the plan on behalf of herself and on behalf of Hilary.

There are a number of disputed issues of fact in the record that preclude a determination at this juncture as to whether Marianne's conduct rose to the level of bad faith. But this is an issue ripe for trial.

Third, although there are questions as to whether Marianne's conduct rose to the level of bad faith, there is no question that her conduct relates directly to the matter at issue. Marianne is now seeking benefits under two ERISA plans that Plaintiffs claim she drafted to benefit herself, in excess of her authority to do so, and funded with company money to which she had no entitlement.

Finally, if Marianne acted in bad faith with respect to her creation of and participation in the ERISA plans, this would both injure Plaintiffs and affect the balance of equities between the parties. If Marianne's conduct constituted bad faith, then her conduct caused Plaintiffs harm. For instance, Plaintiffs claim that Marianne transferred company money to fund a 401(k) account in which she is the beneficiary. If Marianne was not actually entitled to these funds – in the form of matching 401(k) contributions – then Plaintiffs suffered losses in the amount of these transfers.

Moreover, if Marianne deceived or misled Hilary about plan terms when she designated herself as a named participant in the Defined Benefit Plan, then Plaintiffs similarly suffer losses in the amount of benefits that Marianne now claims under that plan.

Again, Plaintiffs have not briefed the defense of unclean hands. However, in her briefing, Marianne insists that any allegedly "bad acts" on her part would not preclude her entitlement to benefits under the Plans. To make this argument, Marianne relies on ERISA's anti-alienation and anti-forfeiture provisions, 29 U.S.C. §§ 1053(a), 1056(d), which mandate that the benefits provided under an ERISA plan may not be assigned or alienated. However, her reliance is misplaced. These provisions bar the garnishment of vested pension benefits by employers, creditors and other third parties. Thus, the provisions are inapplicable here where Marianne's entitlement to retirement benefits has been put into question and accordingly, where HRH has not withheld vested benefits to which Marianne has an undisputed entitlement.

The cases cited by Marianne – *Kickham Hanley P.C. v. Kodak Ret. Income Plan*, 558 F.3d 204 (2d Cir. 2009), *Guidry v. Sheet Metal Workers Nat. Pension Fund*, 493 U.S. 365 (1990), and *Thomas v. Bostwick*, No. 13 Civ. 02544, 2014 WL 4364816, at *1 (N.D. Cal. Sept. 3, 2014) – are inapposite to the case at hand. Each of these cases concern the alienation or forfeiture of vested pension benefits to which the plaintiff had a clear entitlement under the relevant plans.

In *Kickham*, 558 F.3d at 209, the district court granted a preliminary injunction in favor of the plaintiff, a law firm that had represented plan participants whose benefits were denied by defendants. This injunction prevented defendants from making pension benefit payments to certain plan participants unless they placed 15 percent of the payments in escrow pending adjudication of the attorney's entitlement to an attorney's fee award from these benefits. *Id*. The Second Circuit concluded that the plaintiff's claim to attorney's fees drawn from undistributed

76

vested pension benefits violated ERISA's anti-alienation provision, 29 U.S.C. § 1056(d)(1). *Id.*
at 210-211. The court recognized that a principal rationale behind ERISA's anti-alienation
provision is "the prohibition of involuntary levies by third party creditors on vested plan
benefits." *Id.* (quoting *Ellis Nat'l Bank of Jacksonville v. Irving Trust Co.*, 786 F.2d 466, 470 (2d
Cir. 1986)). It stated, "Such a prohibition supports Congress's primary objective of ensuring
through ERISA that, *'if a worker has been promised a defined pension benefit upon retirement –
and if he has fulfilled whatever conditions are required to obtain a vested benefit . . . he actually
receives it.'"* *Id.* (quoting *Ellis Nat'l Bank of Jacksonville*, 786 F.2d at 471) (emphasis added).
Thus, *Kickham*'s language sets as a precondition to the application of anti-forfeiture and anti-
alienation principles that a pensioner must have had an actual entitlement to promised pension
benefits and must have fulfilled the requirements to receive vested benefits.

In *Guidry*, 493 U.S. at 367, the Supreme Court considered whether a district court
properly imposed a constructive trust to garnish the pension benefits of a former union executive
who had pleaded guilty to embezzling funds from his union. In that case, there was no question
that petitioner's employment made him eligible to receive benefits from three union pension
funds. *Id.* The petitioner later pled guilty to embezzling substantial sums of money from the
union, and while serving his prison sentence, filed a complaint, alleging that the plans had
wrongfully refused to pay him the benefits to which he was entitled. *Id.* at 368. Two of the plans
had withheld the petitioner's accrued benefits and contended that petitioner forfeited his right to
receive benefits of his criminal misconduct. *Id.* at 369. The union, which intervened as a party,
asserted that the benefits had not been forfeited, but that a constructive trust should be imposed
so that the benefits would be paid to the union rather than to the petitioner. The Supreme Court
held that garnishment – including through a constructive trust – is prohibited under Section

206(d)(1), 29 U.S.C. § 1056(d)(1), unless some exception to the general statutory ban is applicable. *Id.* at 371-372. Still, this case involved garnishment of a pensioner's vested pension benefits, to which he had an undisputed entitlement.

Finally, in *Thomas v. Bostwick*, No. 13 Civ. 02544, 2014 WL 4364816, at *6 (N.D. Cal. Sept. 3, 2014), although the defendant, the plan trustee, argued that the plaintiff forfeited his right to benefits by embezzling money from the employer that sponsored the plan, the court rejected the argument because the plaintiff's benefits were vested and nonforfeitable under Section 203(a), 29 U.S.C. § 1053(a), notwithstanding the plaintiff's criminal conduct. In that case, after the employer obtained a civil judgment and restitution order against the plaintiff, the employer received funds from the plaintiff's plan accounts and credited them against his debts to the company. *Id.* at *2. In reaching its conclusion, the court noted, "The fact that [the plaintiff's] benefits were credited against his debts strongly suggests that he was never found ineligible. If [the plaintiff] had been judged ineligible for benefits, there would be no reason to grant him credit." *Id.* at *6 n. 9. Again, this case concerns the forfeiture or alienation of vested benefits to which plaintiff was indisputably entitled under the plan.

Because Marianne's very entitlement to the benefits she now claims is in dispute – and indeed, HRH determined in its administrative review that she was *not eligible* to receive those benefits – ERISA's anti-forfeiture and anti-alienation provisions do not prevent Plaintiffs from asserting their unclean hands defense at trial.

The parties devoted much of their briefing to the question of whether HRH's decision to deny Marianne benefits under the Defined Benefit Plan and the 401(k) Plan was arbitrary and capricious. But because genuine issues of material fact exist as to that question and because

Plaintiffs have asserted a defense of unclean hands, Marianne's counterclaim cannot be resolved at this stage in litigation and will be adjudicated at trial.

Marianne's motion for partial summary judgment is, therefore, denied.

## CONCLUSION

Defendant's motion to add Counterclaim Defendant and to amend the pleadings is GRANTED. Defendant's motion for partial judgment on the pleadings is DENIED. The parties' cross-motions for partial summary judgment are DENIED.

The case will be tried on October 23, 2017. The Final Pretrial Conference will be held on October 13, 2017 at 11:00 A.M. The parties are directed to submit an updated Joint Pretrial Order in advance of the Final Pretrial Conference. Counsel should read my individual rules and be prepared to obtain rulings on all objections to proposed exhibits. Motions in limine must be filed by September 1, 2017.

The Clerk of Court is directed to remove Docket Nos. 76, 101, 121, and 136 from the Court's list of pending motions.

Dated: June 22, 2017

_____

Chief Judge

BY ECF TO ALL COUNSEL

79